**Michael Joseph JORDAN, Appellant,**

v.

**Lucy Evan JORDAN, Appellee.**

No. S–8459.

Supreme Court of Alaska.

July 30, 1999.

---

Michael Joseph Jordan, pro se, Seward.

Mark Regan and James J. Davis, Jr., Juneau, and Robert K. Hickerson, Anchorage, Alaska Legal Services Corporation, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

This appeal arises from Michael and Lucy Jordan's divorce. The superior court denied court-appointed counsel to Michael, awarded custody of the couple's three children to Lucy, and accepted the couple's property settlement agreement. Michael appeals these actions. We affirm.

## II. FACTS AND PROCEEDINGS

Lucy and Michael Jordan were married in Lower Kalskag in 1983. The Jordans have two daughters and a son: daughters J.J. (fifteen years old) and F.J. (twelve), and son S.J. (thirteen). Lucy alleges that Michael beat her and attempted to strangle her with a rabbit snare in January 1995. Michael was convicted of first-degree assault for these attacks and is presently serving an eight-year sentence at the Spring Creek Correctional Center in Seward. Lucy filed a complaint for divorce in August 1995.

Michael raises eight separate issues for review which this opinion will address in four sections: (1) child custody issues; (2) denial of counsel issues; (3) property settlement issues; and (4) sanctions under Alaska Civil Rule 11. The specific procedural and factual history of each of these claims, along with the standard of review for each, will be discussed in its respective section.

## III. DISCUSSION

### A. Child Custody Issues

In early August 1995 the three children went to live with Michael's brother and sister-in-law in North Carolina. S.J., the son, was later sent to live with Michael's sister and brother-in-law in Virginia. In February 1996 the court issued an interim custody order giving custody of the girls to Lucy. The girls returned immediately to Lower Kalskag. The court awarded interim custody of S.J. to Michael with physical placement and custody to remain with Michael's sister and brother-in-law in Virginia. The court found that S.J.'s special academic, social, emotional, and physical needs were being well addressed there. S.J. was to spend the summers with Lucy and his sisters in Lower Kalskag.

When S.J. returned to Lower Kalskag for his 1996 summer visit, Lucy filed a motion seeking to have S.J. stay permanently. This motion was denied and S.J. returned to Virginia for the school year.

After numerous delays, the Jordans' divorce went to trial on February 10, 1997. On February 3 Lucy, an Alaska Native, filed a pre-trial memorandum seeking the immediate return of S.J. In this memorandum she raised, for the first time, Indian Child Welfare Act[1] (ICWA) issues relating to S.J. living with non-Native, non-parent relatives outside of Alaska.

The court issued its opinion and order on March 4, 1997. In that decree the court found, among other things, that S.J. should "at least finish the school year [in Virginia] before returning to Lower Kalskag." The decree provided that S.J. would "return to Kalskag as soon as possible, consistent with his best interests." The court rejected Lucy's ICWA argument, stating that it was

---

1. 25 U.S.C. §§ 1901–63.

barred by equitable estoppel and waiver doctrines.

Lucy sought and was granted a petition for review from this court. In an order dated June 5, 1997, we vacated and remanded the case back to the superior court and held that, with regard to the custody of S.J., the case was governed by ICWA and *Turner v. Pannick*.[2]

■ ICWA requires that, before a foster care placement may be made in a case involving an Indian child, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[3]

■ In *Turner*, we held that for a nonparent to gain custody of a child, the nonparent—in this case Michael's family—must prove either that the parent (Lucy) is unfit or has abandoned the child or that the welfare of the child requires that the non-parent be awarded custody.[4]

A hearing on remand was held on August 22, 1997. There Michael put on witnesses who testified to S.J.'s educational progress, S.J.'s interaction with the village and his family, Lucy's behavior as a parent and her recent drinking habits. On September 24, 1997, the superior court ruled that Michael had not met either the ICWA or *Turner* burdens and ordered that S.J. stay in Lower Kalskag with Lucy and not return to Virginia for the school year.

1. *Even if the superior court should not have excluded Michael's expert witnesses, any error was harmless.*

■ Michael argues that the court erroneously disregarded testimony of expert witnesses.[5] The court stated that it rejected the proposed experts because: (1) none of the witnesses presented evidence regarding Lucy's parental fitness, nor had they had any contact with Lucy, thus, these experts would not help Michael overcome his *Turner* burden; and (2) none of the proposed experts was familiar with Native or Yupik culture and thus would not qualify as ICWA experts.

We have noted the following guidelines for the acceptance of expert witnesses under ICWA:

The Department of Interior issued Guidelines for State Courts, 44 Fed.Reg. 67583–95 (1979) (hereinafter Guidelines). Those applicable to 25 U.S.C. § 1912(f) state:

Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having *substantial education* in the area of his or her specialty.

*Matter of Parental Rights of T.O.*, 759 P.2d 1308, 1309 n. 3 (Alaska 1988) (emphasis added).

The superior court's ruling rejecting the witnesses as experts was problematic. At least two of the witnesses, Burroughs and Cooke Read, appeared to meet the third basis to qualify as expert witnesses—"substantial education" in the field of their specialty—as both had graduate degrees in their field of specialty. The superior court appears to have ruled that because the proposed witnesses did not meet the first two guidelines they were unqualified, without considering the third guideline.

---

2. 540 P.2d 1051 (Alaska 1975).

3. 25 U.S.C. § 1912(e).

4. *Turner*, 540 P.2d at 1055.

5. The determination of the acceptance of expert witnesses under ICWA is reviewed for abuse of discretion. *See Matter of Parental Rights of T.O.*, 759 P.2d 1308, 1310 (Alaska 1988).

However, even if this exclusion was questionable, it caused no harm, because the proposed experts had no knowledge of Lucy's parental fitness, nor the services available to S.J. in the Lower Kalskag public schools. Therefore, given the high ICWA and *Turner* barriers to gaining non-parental custody, the testimony, even if credited, could not have led to S.J.'s removal from Lucy's custody. Under these circumstances, even if it was technical error to exclude the experts' testimony, it was harmless.

> 2. *The superior court did not abuse its discretion by failing to order substance abuse counseling for Lucy as a condition of custody.*

 Michael also contends that the court erred because it did not order substance abuse counseling for Lucy as a condition of custody.[6] This argument is unavailing. The record does not show that Michael ever asked that Lucy be required to undergo alcohol counseling as a condition of custody. Furthermore, the court found "uncontroverted" evidence that Lucy had not had any problem with alcohol in the past year and that she was an excellent parent.

### B. *Counsel Issues*

Lucy was and still is represented by counsel. Michael was originally represented by an attorney but contends that he ran out of funds and thus was unable to continue to afford counsel. On October 8, 1996, Michael, now *pro se*, asserted that he was indigent and filed a motion for appointment of counsel. Along with this motion, Michael filed a financial statement which listed family assets of $212,000 and debts of $36,000, for a total unencumbered net family worth of $176,000.

The court denied Michael's motion for appointment of counsel, finding: "Mr. Jordan is not indigent, on the face of his financial statement. This court would consider motions to liquidate part of the marital estate to allow Mr. Jordan to hire an attorney." Michael asserts that he made a proposal to liquidate assets on which the court never acted, but the record does not support this assertion. Michael appeared *pro se*, telephonically from Spring Creek, for the rest of the proceedings.

The assets listed on Michael's financial statement break out as follows: (1) land, buildings, and trailers, $190,000; (2) motor vehicles, $6,000; (3) snow machines and boats, $16,000.

This financial statement is less extensive and detailed than a marital asset list and proposed property division sent by Michael to Lucy's attorney on May 20, 1996. This letter became the basis of the property settlement and is the only detailed listing of the marital assets in the record.

The most valuable asset is the family home in Lower Kalskag, which Michael valued at $118,000. Michael stated that he built an apartment and a restaurant/grocery adjacent to the home and he valued these buildings and fixtures at $94,000. Thus, the total value of the Lower Kalskag property was $212,000.

Prior to the marriage, Michael acquired a one-half interest in sixty acres of land in Copper Center. Michael stated that the value of the one-half interest was $60,000 less a $36,000 mortgage, for total equity of $24,000. It is not clear if this land became part of the marital estate or if the mortgage was paid out of marital funds, but Michael listed it as marital property.

Therefore, the value of the Jordans' real property, by Michael's own valuation, was $236,000.

While Michael was not required to list other personal property and tools in the financial statement to the court, he listed significant chattels in his letter to Lucy's attorney including: $21,418 in household items, $2,594 in fishing gear and nets, $2,200 in logging equipment and $16,730 in building materials. The value of these additional assets totals $42,942.

---

6. Trial courts are vested with broad discretion in child custody matters. *See Gratrix v. Gratrix,* 652 P.2d 76, 79 (Alaska 1982). We will reverse a trial court's resolution of custody issues only if we are convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous. *See id.* at 79–80.

Thus, a rough estimate of the value of the Jordans' marital property, using Michael's valuations, was $300,942 ($236,000 real property, plus $6,000 in motor vehicles, plus $16,000 in boats, plus $42,942 in other assets, equals $300,942).

At the beginning of the trial on February 10, 1997, Michael renewed his objections to proceeding without counsel and reiterated that he was indigent. This objection was noted and denied, the court finding that Michael had been given ample time to liquidate assets to hire a lawyer.

1. *The superior court did not clearly err in determining that Michael was not indigent.*

█ It is well established that the due process clause of the Alaska Constitution[7] gives an indigent parent, in some instances, the right to court-appointed counsel in a child custody proceeding.[8] Because Michael was not indigent, however, he does not have the right to court-appointed counsel.[9] Indigency is defined in the Public Defender Agency statute as follows:

> "indigent person" means a person who, at the time need is determined, does not have sufficient assets, credit, or other means to provide for payment of an attorney and all other necessary expenses of representation without depriving the party or the party's dependents of food, clothing, or shelter....[10]

█ Given that the Jordans had $200,000 to $300,000 in marital assets, it would appear that sufficient assets existed for Michael to pay for an attorney without encumbering the family home. Michael was given ample opportunity to ask the court to allow him to liquidate assets but he chose not to do so.

We have previously held: "Nonindigents who must pay for counsel may choose to forego counsel because they believe that the benefits of counsel's service are outweighed by its costs. The fact that our market system forces nonindigents to make such a choice has never been regarded as a deprivation of the right to counsel...."[11]

## C. Property Settlement Issues

The May 20, 1996 letter that Michael sent to Lucy's attorney which listed, valued, and proposed a division of the marital property became the starting point for the ultimate voluntary settlement entered into at trial. At trial, this letter was entered into evidence. This agreement was memorialized in the Findings of Fact and Conclusions of Law issued by the court on May 30, 1997. The settlement was quite similar to that proposed in Michael's letter and much of it was negotiated on the record. The settlement's main points are that Lucy received the bulk of the marital property, including the Lower Kalskag home. Michael received the Copper Center land, a boat, a truck, logging equipment, construction and welding equipment, tools, all of his personal property, and miscellaneous other items.

1. *The superior court did not err in accepting the Jordans' property settlement agreement.*

█ Michael now protests this property settlement. Michael's principal argument is that the court erred by not (1) determining what assets are marital; (2) valuing those assets; and (3) equitably dividing the assets. This three-step process has become known as applying the "*Wanberg*[12] factors."

7. *See* Alaska Const. art. I, § 7.

8. *See Flores v. Flores*, 598 P.2d 893, 893–94 (Alaska 1979).

9. Since the determination of Michael's indigency is a factual question, the superior court's decision is subject to the "clearly erroneous" standard of review. *See Adrian v. Adrian*, 838 P.2d 808, 811 (Alaska 1992); Alaska Rule of Civil Procedure 52(a) (a trial court's factual findings "shall not be set aside unless clearly erroneous"). To reverse such findings, we must be left with "a definite and firm conviction on the whole record that the judge made a mistake." *Smith v. Smith*, 673 P.2d 282, 283 (Alaska 1983) (citations omitted).

10. AS 18.85.170(4).

11. *State v. Albert*, 899 P.2d 103, 112–13 (Alaska 1995).

12. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

Michael misconstrues the law. The *Wanberg* factors are not applied to settlement agreements. Instead, we have held that "insofar as an agreement relates to the division of property, the separation agreement should be controlling in the absence of fraud, duress, concealment of assets or other facts showing that the agreement was not made voluntarily and with full understanding." [13] Michael does not make such a showing. Indeed, that argument would be non-sensical, since his May 20, 1996 letter formed the template for the final agreement, and his vigorous negotiations during [14] and after [15] the trial were almost entirely successful.

For these reasons, the superior court did not err in enforcing the property settlement agreement.

### D. *Civil Rule 11 Sanctions*

Michael asserts that Civil Rule 11 [16] sanctions should be imposed upon Lucy's attorney for two contacts he had with persons outside of the court. But Michael's assertions do not bring these matters within the purview of Rule 11, which governs pleadings, motions, and other papers filed with the court. Michael's allegations, if true, may be brought to the attention of the Alaska Bar Association. But they are collateral to this appeal and do not form a basis for overturning any action of the superior court in resolving this case.

## IV. *CONCLUSION*

We AFFIRM the superior court's decisions in declining to appoint counsel for Michael, in awarding custody, and in accepting the couple's property settlement agreement.

---

13. *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996) (quoting *Kerslake v. Kerslake*, 609 P.2d 559, 560 n. 1 (Alaska 1980)(internal quotation marks omitted)).

14. At one point in the trial, Michael interrupted Lucy's testimony to "get to the bottom line: Am I going to be able to have my property [the Copper Center land]?" He obtained that property, then commenced an on-the-record negotiation, in which he obtained every item of property he sought. Over the next two days, the negotiations continued outside of court and were reported by counsel and Mr. Jordan to the court each day. They ended with agreement on "the final outstanding issue in the property part of this case."

15. The superior court noted in the Findings of Fact and Conclusions of Law that "[a]fter the trial [Michael] contacted [counsel for Lucy] and

stated that there were other items, marital and otherwise, that he wanted to be awarded." Lucy agreed to all but certain of the requested items. These concessions were wrung after Michael agreed on the record to have reached "final" agreement with Lucy as to property.

16. Civil Rule 11 provides, in part:

Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name.... The signature of an attorney or party constitutes a certificate by the signer that ... to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted ..., and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless expense in the cost of litigation.