**L.G., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

No. S–9140.

Supreme Court of Alaska.

Dec. 15, 2000.

Michelle McComb, Assistant Public Defender, Fairbanks, Barbara Brink, Public Defender, Anchorage, for Appellant.

Nora King, Assistant Attorney General, Fairbanks, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

I. *INTRODUCTION*

The parental rights of L.G. (Linda)[1] to her daughters, J.G. and S.G., were terminated on April 1, 1999. Superior Court Judge Richard D. Savell found that there was evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that the daughters were likely to suffer serious emotional and physical harm if returned to Linda's custody. Judge Savell also found that there was good cause to deviate from the placement preferences of the Indian Child Welfare Act (ICWA) to place J.G. with Foster Mother P.S. Linda appeals. We conclude that Judge Savell's findings are supported by the evidence and affirm the termination of

---

1. A pseudonym has been used for L.G.

parental rights and the finding of good cause to deviate from ICWA's placement preferences.

## II. *FACTS AND PROCEEDINGS*

J.G. was born on September 16, 1991. In the first year after J.G.'s birth, Linda lived intermittently with her daughter at the Polaris Hotel in Fairbanks, a site known for drug trafficking and prostitution. Linda's long history of substance abuse continued after J.G.'s birth, leading to Linda's hospitalization and her arrest for assaulting her brother with a knife while drunk. While Linda was drinking or hospitalized because of drinking, she left J.G. with J.G.'s father, A.D. (Father). Doctors saw burn marks on the child when Father brought J.G. to the hospital to visit Linda.

In the fall of 1992 Deborah Hayes, an intern with the Division of Family and Youth Services (DFYS), was admitted to Linda's room at the Polaris Hotel. J.G. had been awake and mobile while Linda slept. After Hayes noticed track marks on Linda's arms, Linda said that Father "made her take drugs" and admitted that she had taken drugs the night before.

Linda was sentenced to seven months in jail for assaulting her brother. During her imprisonment, Linda left J.G. in Father's care. After being released from jail, Linda continued to drink to excess, violated her probation by using cocaine, and was returned to jail. Linda again left J.G. with Father, despite her reservations about his ability to care for the child; Linda had at least once left J.G. in Father's care and returned to find him intoxicated.

J.G. came into state custody for the first time when Father reported that he could not continue to care for the child. J.G. was placed with Linda's mother, C.L. (Grandmother). On May 9, 1994, however, Grandmother asked that the child be placed elsewhere. That same day, Linda's brother dropped the child off at the social work division with Lorita Clough, a social worker whom the child had never met. J.G. was unable to understand what was happening, and repeatedly asked where her uncle was.

J.G. was placed in the Village Center, but was removed from there after one month and eleven days. J.G. was then placed with Shirley Moses, but was removed after ten days when a caseworker realized that Moses had gone north to work and left J.G. in the care of her daughter. On July 6, 1994, J.G. was placed with Foster Mother P.S.

When Foster Mother P.S. became J.G.'s foster parent, J.G. appeared to be developmentally delayed. J.G. did not speak in complete sentences, screamed for what she wanted, and tended to be violent. Foster Mother P.S. established a routine for J.G., and J.G. was able to overcome her developmental delays and behavioral problems. While in Foster Mother P.S.'s care, J.G. was taken to see her grandparents almost every Sunday.

When released from jail for the birth of S.G., Linda was directed to enter a treatment program. S.G. was born on October 1, 1994, but Linda did not enter a treatment program until March 1995. While out of jail, Linda never saw J.G. Linda was sent back to jail for using cocaine in April 1995, and S.G. was eventually placed with Foster Mother R.K. Foster Mother P.S. brought J.G. to visit her mother while Linda was in jail, but J.G. exhibited little reaction to these visits.

Linda went from jail into the Regional Center for Alcohol and Other Addictions in May 1995. In June she entered the Women and Children's Residential Treatment Program. Her participation in treatment was court-ordered. While in the Women and Children's structured residential program, Linda was, in many respects, a model client.

Linda was reunited with her children in October 1995. After being returned to Linda's care, J.G. would attach to adults and then become fearful if separated from them. J.G. was also violent towards other children. Because J.G. appeared anxious, she was prescribed Defakote. Although J.G. had been returned to her mother's custody, Foster Mother P.S. continued to care for J.G. almost every Saturday.

Linda left the Women and Children's program in early 1996. Within two weeks of leaving, she relapsed. Foster Mother R.K. had repeatedly attempted to call Linda on

one evening during this period. Foster Mother R.K. was told by J.G. that she could not get Linda up, although Foster Mother R.K. could hear the child trying to awaken her mother. On the day of her relapse, Linda passed out. When Women and Children's personnel came to the apartment to help her get the children ready for day care and Head Start, Linda was still passed out and still intoxicated. Lynn Marie Eldridge, the clinical supervisor for the Women and Children's program, testified that this relapse was cocaine based. Linda refused to submit to urinalysis, but did agree to enter detox. J.G. and S.G. were placed in Foster Mother R.K.'s home.

After detox, Linda re-entered the Women and Children's program and the children were returned to her care. Within a week, however, Linda relapsed again. Eldridge testified that this relapse, too, involved cocaine use. Linda again refused to submit to urinalysis, and her children were placed with Foster Mother R.K. Foster Mother P .S. continued to maintain contact with J.G. after the girl was placed with Foster Mother R.K., and took care of her almost every weekend.

Linda returned to serious alcohol abuse, which resulted in her hospitalization, caused her to fear for her own life, and led her to drink for three days in a row without sleep. Ultimately, Linda asked the Women and Children's program to readmit her, knowing that her parental rights could be terminated if she did not change her life. Linda was required to spend three months at the Regional Center for Alcohol and Other Addictions before re-entering the Women and Children's program. After Linda re-entered the Women and Children's program, J.G. and S.G. were again placed with her. While in the Women and Children's program, Linda successfully completed her GED and worked for a short time at a part-time job.

After being discharged from the Women and Children's program, however, Linda's urinalysis tested positive for cocaine. J.G. and S .G. were again removed from Linda's custody. The girls were first placed with Emily Crook, but Crook asked that the children be removed from her care because of S.G.'s behavior. J.G. and S.G. were then placed in the Bermudez foster home, a non-ICWA compliant placement, because their younger sister had been placed there.

Linda refused to enter extended residential treatment in Anchorage, and was unsuccessful in gaining admission to the Regional Center for Alcohol and Other Addictions as an out-patient. Linda visited her children at DFYS only twice. Linda was charged with DWI in October 1997. During the next twelve months, Linda never saw her children.

After months went by without contact between Linda and her children, DFYS's ICWA committee unanimously recommended that Linda's parental rights be terminated and that the children be immediately placed in permanent homes. Despite the fact that such a placement would be non-ICWA compliant, the committee believed that J.G. clearly needed to be placed with Foster Mother P.S. J.G. was placed with Foster Mother P.S., and S.G. was placed with Foster Mother R.K.

While in Foster Mother R.K.'s custody, S.G. encountered Linda at Grandmother's house. S.G. exhibited out-of-control behavior after that encounter. S.G. has also had nightmares. According to Foster Mother R.K., S.G. has said that she misses her sisters, but has never mentioned Linda and shows no desire to return to her mother.

The State of Alaska, Department of Health and Social Services, petitioned to terminate Linda's parental rights to J.G. and S.G. and to commit the girls to the department's custody for adoptive purposes. After seven days of hearings, Judge Savell issued an oral ruling and a written order terminating Linda's parental rights and finding good cause to deviate from ICWA's placement preferences so as to place J.G. with Foster Mother P.S. Linda appeals.

## III. DISCUSSION

### A. Standard of Review

 In a case involving the termination of parental rights, the trial court's factual findings will be reviewed under a clearly erroneous standard, and will be overturned only if this court is left with a definite and

firm conviction that a mistake has been made.[2] The trial court's decision that a witness is qualified to testify as an expert is reviewed for abuse of discretion;[3] the test for determining abuse of discretion is whether the reasons for the exercise of discretion are clearly untenable and unreasonable.[4] However, a determination of whether the trial court's findings comport with the requirements of ICWA involves a question of law and will be reviewed de novo.[5]

■ We will reverse a lower court's adoptive placement preference determination only if convinced that the record as a whole reveals an abuse of discretion or if controlling factual findings are clearly erroneous.[6] The trial court abuses its discretion if it considers improper factors or improperly weighs certain factors in making its determination.[7]

B. *The Superior Court Did Not Err in Terminating Linda's Parental Rights.*

1. *Substantial evidence supported the superior court's finding that J.G. and S.G. would suffer serious emotional harm if returned to Linda's custody.*

■■ In his oral findings and written order terminating Linda's parental rights to J.G. and S.G., Judge Savell stated that there was "evidence beyond a reasonable doubt, including the testimony of expert witnesses[,] that [J.G.] and [S.G.] would suffer serious emotional ... harm if returned to the care and custody of [Linda]." Linda argues that because there was no evidence that J.G. and S.G. had suffered from significant behavioral difficulties in the past, Judge Savell erred in

finding that Linda's continued custody of her children was likely to cause them serious emotional harm. However, our review convinces us that Judge Savell's finding of likely future emotional harm is amply supported by the evidence.

Termination of parental rights to an Indian child requires "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child."[8] Because § 1912(f) "looks to likely future harm to the child,"[9] a trial court's findings "properly focus[ ] on the risk of future harm ... rather than on the infliction of past injury."[10] Contrary to Linda's argument, then, termination of her parental rights did not require proof that her daughters had suffered serious emotional harm in the past; rather, it only required proof that they were likely to suffer such harm in the future.

■ Proof that a parent's continued custody of her children is likely to cause them serious harm requires both proof that the parent's conduct is likely to harm the children, and proof that it is unlikely that the parent will change her conduct.[11] These two elements can be proved through the testimony of a single expert witness,[12] by aggregating the testimony of expert witnesses,[13] or by aggregating the testimony of expert and lay witnesses.[14]

Substantial lay testimony established the effects of Linda's repeated substance abuse on her children. J.G. and S.G. were both

2. *See E.M. v. State, Dep't of Health and Social Servs.*, 959 P.2d 766, 768 (Alaska 1998).

3. *See Jordan v. Jordan*, 983 P.2d 1258, 1261 n. 5 (Alaska 1999).

4. *See Bailey v. Lenord*, 625 P.2d 849, 854 (Alaska 1981).

5. *See E.M.*, 959 P.2d at 768.

6. *See In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993).

7. *See id.*

8. 25 U.S.C. § 1912(f).

9. *In re J.R.B. & T.W.G.*, 715 P.2d 1170, 1172 (Alaska 1986).

10. *E.M.*, 959 P.2d at 771.

11. *See In re Parental Rights of T.O.*, 759 P.2d 1308, 1310 (Alaska 1988).

12. *See D.A.W. v. State*, 699 P.2d 340, 342 (Alaska 1985).

13. *See In re Parental Rights of T.O.*, 759 P.2d at 1310–11.

14. *See In re Kreft*, 148 Mich.App. 682, 384 N.W.2d 843, 847–48 (1986).

first placed in state custody after Linda violated her probation by using cocaine. Both girls were again taken from their mother's custody after her first, second, and third relapses, each of which also involved the use of cocaine.

Qualified expert witnesses testified that repeated separations like those endured by J.G. and S.G. were likely to cause the girls serious emotional harm. Deborah Hayes, who qualified as an expert witness in social work with a speciality in permanency planning, testified that multiple placements make it harder for children to attach to their caregivers. Hayes also testified that children who do not have a healthy attachment to a permanent caregiver are more likely to exhibit emotionally disturbed behaviors, including tantrums and aggression.

Dr. Marti Cranor, who qualified as an expert in clinical psychology with a specialty in child protection, testified that children removed from substance abusing parents will have greater attachment issues and a greater need for consistent, routine, and predictable interactions with their caregivers. Dr. Cranor also testified that it was essentially too late for J.G. and S.G. to be returned to their mother's custody—because the girls had already endured so many placements, to remove them from their current placements would impair their ability to attach to any caregiver in the future.

The expert testimony of Hayes and Dr. Cranor was backed up by the evidence of J.G. and S.G.'s past behavioral problems. After Linda's probation violation for cocaine use sent J.G. on an odyssey from Father's care to Grandmother's, from Grandmother's to Clough's, from Clough's to the Village Center's, from the Village Center's to Moses's, from Moses's to Moses's daughter's, and finally from Moses's daughter's to Foster Mother P.S.'s, she arrived in Foster Mother P.S.'s care a violent and developmentally delayed child. Although J.G. overcame her behavioral problems in Foster Mother P.S.'s care, she again became violent, disruptive, and anxious when she was returned to Linda.

Linda's relapses into cocaine use sent S.G., too, through multiple placements. Like J.G., S.G. experienced behavioral problems as a consequence. When J.G. and S.G. were placed with Crook after Linda's third and final relapse, S.G.'s behavioral problems caused Crook to request the girls' removal. When moved from Crook's to Foster Mother R.K.'s care, S.G. cried during the day and had nightmares at night. After S.G. encountered Linda while on an overnight visit to her grandmother's house, S.G. threw a violent fit and hit both Foster Mother R.K. and her husband.

Given this evidence, there was no clear error in the trial court's factual findings that Linda's repeated separations from her daughters had caused them serious mental injury, and that both girls were at a substantial risk of suffering further mental injury if returned to her care.

2. *The trial court did not abuse its discretion by qualifying Lorita Clough as an expert in Yupik culture.*

■ Linda also argues that Judge Savell erred in qualifying Lorita Clough as an expert witness. Our review of the record convinces us that Judge Savell did not abuse his discretion by qualifying Clough as an expert witness in Yupik culture.

■ By setting such a strong standard of proof in § 1912(f), Congress intended to keep Native children from being separated from their families solely on the basis of testimony from social workers who lacked the familiarity with Native culture necessary to distinguish between "the cultural and social standards prevailing in Indian communities and families" and actual abuse or neglect.[15] A witness may gain the familiarity that will qualify her as an expert under ICWA either through personal contact, or through work experience, with Native cultures. In *In re Parental Rights of T.O.*, for example, we held that a trial judge did not abuse his discretion in qualifying two witnesses as experts, where one witness, a social worker, was a member

---

**15.** 25 U.S.C. § 1901(5); *see also* H.R.Rep. No. 1386 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7532–33.

of the relevant Native community and had Native children, and the other had twenty years of experience teaching and counseling Native Alaskans.[16] Similarly, the guidelines to ICWA state that:

> [M]ost likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings [are] . . .
>
> (i) *A member of the Indian child's tribe* who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices; [or]
>
> (ii) A lay expert witness having *substantial experience in the delivery of child and family services to Indians,* and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.[17]

Clough was raised in Chevak, while J.G. and S.G.'s tribal affiliation is with the village of Emmonak. Clough, J.G., and S.G. are all Yupik, however. Clough offered undisputed testimony that Yupik child-rearing practices in Chevak and Emmonak are the same. Clough learned about Yupik child-rearing practices through knowledge passed on by village elders, and was able to describe the important role played in child rearing by the Yupik extended family. Clough regularly sought input from the appropriate village when her work involved Native children, and had asked the village of Emmonak to send a member to Fairbanks to meet with J.G. and S.G.

At the time of the hearing, Clough had worked for DFYS as a social worker for almost ten years. Ninety percent of the mothers and children with whom Clough had worked were Alaska Natives, and some of them were Yupik. Before joining DFYS, moreover, Clough had worked at the Fairbanks Native Association's Youth Drug & Alcohol Prevention and Women in Crisis Counseling and Assistance Programs.

■ The trial judge's reasons for qualifying an expert witness must be clearly untenable and unreasonable to constitute an abuse

of discretion.[18] Judge Savell specifically requested that the state provide further foundation evidence establishing a "nexus with family and child-rearing practices" after Linda's counsel first objected to Clough's qualifications as an expert in Yupik culture. After hearing further testimony about Clough's knowledge of Yupik child-rearing practices and family structure, the trial judge acted within his discretion in deciding that Clough was qualified to testify as an expert by virtue of her personal familiarity with Yupik culture and her ten or more years of experience working with Native children and mothers.

3. *When there is clear evidence of physical neglect, a trial judge may terminate parental rights without hearing testimony from an expert in Native culture.*

■ Lorita Clough was the only witness whom the trial judge qualified as an expert in Native culture. In arguing that Clough was not qualified as an expert in Yupik culture, Linda implicitly argues that her parental rights should not have been terminated without hearing testimony from at least one expert in Native culture. In response, the state contends that ICWA does not require testimony from an expert in Native culture when cultural concerns are not implicated in a termination proceeding, and that Linda's physical neglect of J.G. and S.G. was not a cultural issue. Given the clear evidence that J.G. and S.G. faced a serious risk of physical neglect if they were returned to their mother's custody, Judge Savell would not have erred in terminating Linda's parental rights even if he had not heard any testimony from an expert in Native culture.

■ Legislative history indicates that the primary reason for requiring qualified expert testimony in ICWA termination proceedings was to prevent courts from basing their decisions solely upon the testimony of social workers who possessed *neither* the specialized professional education *nor* the familiarity with Native culture necessary to distin

---

**16.** *See* 759 P.2d 1308, 1309–10 (Alaska 1988).

**17.** 44 Fed.Reg. 67,593 (1979).

**18.** *See Bailey v. Lenord,* 625 P.2d 849, 854 (Alaska 1981).

guish between cultural variations in child-rearing practices and actual abuse or neglect.[19] Because ICWA does not always require testimony from witnesses with *both* types of expertise,[20] however, virtually all the courts that have considered the question have concluded that so long as a termination proceeding does not implicate cultural bias, ICWA's proof requirements can be satisfied by a qualified expert witness without any special familiarity with Native cultural standards.[21] Accordingly, where there is clear evidence that a child faces a serious risk of physical neglect if she remains in her parent's care, a trial judge may terminate parental rights without hearing testimony from an expert in Native cultures.[22]

Our conclusion that termination proceedings under § 1912(f) will not always require testimony from an expert in Native culture is consistent with our holding in *E.M. v. State, Department of Social Services.*[23] In *E.M.*, lay testimony established that, on numerous occasions, E.M. left his child alone or "in the care of anyone who happened to be present in [E.M.'s] apartment;" that E.M.'s residence was dangerous; and that E.M. had repeatedly refused to submit to urinalysis and made "little or no progress in attempting to meet

the requirements of his court-ordered case plan."[24] A doctor and a social worker testified, as expert witnesses, that the father's unstable conduct was likely to continue and that he would not be able to provide a safe home for his child.[25] Despite the fact that neither expert witness had any special knowledge of Native culture or child-rearing practices, we affirmed the trial court's order terminating the father's parental rights.[26]

Like E.M.'s child, J.G. and S.G. were put at risk of serious physical harm by Linda's neglect. Linda raised J.G. in a hotel known for drug trafficking and prostitution, and lived there with a man who, by Linda's own account, forced her to take drugs. Linda left her daughters unsupervised while she was under the influence of alcohol or drugs, and left her children in the custody of an inadequate caretaker while she was out drinking, hospitalized because of drinking, and imprisoned after assaulting her brother while drinking.

There was also substantial evidence that Linda's physical neglect of her children was likely to continue. Linda had repeatedly violated her parole and the requirements of her treatment programs by drinking, doing

**19.** See 25 U.S.C. § 1901(5); *see also* H.R.Rep. No. 1386 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7532–33.

**20.** See *Jordan v. Jordan*, 983 P.2d 1258, 1261 (Alaska 1999) (noting that, despite their lack of familiarity with Native culture, two experts "appeared to meet the third basis to qualify as expert witnesses—'substantial education' in the field of their speciality").

**21.** See *Rachelle S. v. Department of Economic Sec.*, 191 Ariz. 518, 958 P.2d 459, 461–62 (App. 1998) ("[D]istinctive knowledge of Indian culture is necessary only when cultural mores are involved."); *People in Interest of R.L.*, 961 P.2d 606, 609 (Colo.App.1998) ("[I]f termination is based on parental unfitness unrelated to Indian culture and society, an expert witness qualified to testify pursuant to 25 U.S.C. § 1912(f) need not possess special knowledge of Indian life."); *In re Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477, 485 (1995) ("Special knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias."); *In re N.L.*, 754 P.2d 863, 868 (Okla.1988) ("The determination [in an ICWA proceeding] must include consideration of tribal family practices unless cultural bias is clearly not implicat-

ed."); *State ex rel. Juv. Dep't v. Tucker*, 76 Or. App. 673, 710 P.2d 793, 799 (1985) ("[W]hen cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life."). *But see In re Welfare of M.S.S.*, 465 N.W.2d 412, 417 (Minn.App.1991) ("The experts should also be conversant with Indian culture and child-rearing practices, lest 'the problems Congress has tried to remedy may remain despite the adoption of [ICWA].' " (citation and internal quotation omitted)).

**22.** See *In re D.C.*, 715 P.2d 1, 1 n. 1 (Alaska 1986) (noting that in a case involving the sexual abuse of the child, there was "no abuse of discretion in the trial court's determination that the witness was a qualified expert for purposes of [ICWA], given her education, training, and work experience in the field of sexual abuse of children.").

**23.** 959 P.2d 766 (Alaska 1998).

**24.** *Id.* at 769–70.

**25.** See *id.*

**26.** See *id.* at 770–71.

drugs, and refusing to submit to urinalysis. Sonia Mazurek, the children's guardian ad litem, told the court that Linda's behavior revealed clear patterns of substance abuse. Mazurek did not believe that Linda could avoid relapse outside the bounds of a structured program, or that either J.G. or S.G. could safely be returned to Linda's custody. Jody Pritchard, who qualified as an expert in the provision of treatment to mothers with substance abuse issues, testified that Linda had been using cocaine as well as alcohol and that cocaine addiction is much harder to treat than alcohol addiction. Pritchard also testified that while Linda had been successful in staying sober within structured treatment programs, her fear of being responsible for her own actions led her to relapse repeatedly upon leaving those programs.

Based upon this lay and expert testimony, the trial court found that Linda's "addictive and habitual use of alcohol and cocaine" had resulted in a "substantial risk to the children;" that Linda's neglect, "each time [she] chose to return to substance abuse," kept her from caring for her children adequately; and that "[Linda's] parental conduct [was] likely to continue." The trial court's factual findings are well supported by the record. Far from reflecting mere cultural differences in the care of Native children, Linda's history of serious substance abuse places J.G. and S.G. at a clear risk of future harm if returned to her custody. Given the clear evidence of physical neglect, termination of Linda's parental rights did not require testimony from an expert in Native culture.

C. *The Trial Court Had Good Cause to Deviate from ICWA's Placement Preferences to Promote J.G.'s Best Interests.*

 Linda contends that there was no "good cause" for the state to deviate from ICWA's placement preferences and place J.G. with Foster Mother P.S. We conclude, however, that Judge Savell's factual finding that J.G. faced a certainty of serious emotional harm if she were removed from Foster Mother P.S.'s custody was not clearly errone-

ous, and that Judge Savell did not abuse his discretion by weighing J.G.'s best interests as of paramount importance in the placement decision.

In any pre-adoptive placement of an Indian child

> a preference shall be given, *in the absence of good cause to the contrary,* to a placement with—
>
> (i) a member of the Indian child's extended family;
>
> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
>
> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.[27]

The state concedes that J.G.'s placement with Foster Mother P.S. is not compliant with ICWA's preferences; Foster Mother P.S. does not qualify under any of the four provisions of § 1915(b), while Grandmother and Foster Mother R.K. (a foster mother approved by J.G.'s tribe) do.

Although ICWA does not define "good cause," this court has held that

> [w]hether there is good cause to deviate from ICWA's placement preferences in a particular case depends on many factors including, but not necessarily limited to, the best interest of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe.[28]

Similarly, the Bureau of Indian Affair's Guidelines offer, as examples of the kinds of factors that can provide good cause to deviate:

> (i) The request of the biological parents or the child when the child is of sufficient age.
>
> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

---

27. 25 U.S.C. § 1915(b) (emphasis added).

28. *In re Adoption of F.H.,* 851 P.2d 1361, 1363–64 (Alaska 1993).

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[29]

Courts in other jurisdictions have held that "the certainty of emotional or psychological damage to the child if removed from the primary caretaker may also be considered by the court in determining whether good cause exists to deviate from the placement preferences of ... ICWA."[30] Most significantly, this court has held that "although ICWA and the guidelines draw attention to important considerations, *the best interests of the child remain paramount.*"[31]

As Judge Savell noted, the experts agreed that removing J.G. from her placement with Foster Mother P.S. was certain to cause her serious emotional or psychological damage. Dr. Cranor testified that—having been through eleven placements already—J.G. was essentially at the end of her capacity to withstand the stress of another placement. Similarly, Lorita Clough testified that because of J.G.'s history of multiple placements, J.G. would not be able to tolerate another move without risking her ability to ever again attach to a caregiver. Mazurek, J.G.'s guardian ad litem, also believed that J.G. could not "make it" unless she stayed in her current placement with Foster Mother P.S. Judge Savell did not clearly err in finding that "[J.G.'s] ability to bond and to trust is at its boundaries; another separation is certain to cause serious emotional harm and would create a significant likelihood that her ability to attach would be irrevocably destroyed."

There was also evidence that J.G. could retain her connection to her tribal heritage even if placed with Foster Mother P.S. J.G.'s permanent placement with Foster Mother P.S. was unanimously approved by DFYS's ICWA review committee, which included an adoption specialist and a Native liaison, usually included a Native Alaskan, and invited participation by the Emmonak tribal representative. J.G.'s placement with Foster Mother P.S. was also supported by Lorita Clough, who testified about the importance of the girls maintaining ties to their extended family and tribal heritage. When Foster Mother P.S. first cared for J.G., moreover, she regularly took the girl to visit with her Native grandparents.

The suitability of alternative placements was a closer question. After J.G. was placed with Grandmother in 1994, Grandmother asked that the child be placed elsewhere and had J.G. dropped off, without further warning, at the office of a case worker whom the two-year-old girl had never met. Over the next five years, Grandmother not only did not offer herself as a placement, but told the DFYS case worker that she considered calls about the girls to be harassment and ordered the case worker never to call again. Although placement with Foster Mother R.K. would allow J.G. to be placed with S.G., Judge Savell specifically found that because of J.G.'s weakened ability to attach, placement with Foster Mother R.K. "would be destructive to [J.G.]."

"[L]argely because of the harm another move would cause," Judge Savell found that there had been, and continued to be, good cause to place J.G. with Foster Mother P.S. Judge Savell did not abuse his discretion by weighing J.G.'s best interests as of paramount importance in finding good cause to deviate from ICWA's placement preferences.

## IV. CONCLUSION

In deciding to terminate Linda's parental rights, Judge Savell found that Linda's history of abandonment and substance abuse placed her daughters at a serious risk of emotional and physical harm if they were returned to her custody. Judge Savell also found that J.G.'s extraordinary emotional needs necessitated her placement with Foster Mother P.S. Both of Judge Savell's decisions are supported by the facts and legally

---

**29.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 (1979).

**30.** *People ex rel. A.N.W.,* 976 P.2d 365, 369 (Colo. App.1999); *see also In re Baby Doe,* 127 Idaho 452, 902 P.2d 477, 487 (1995).

**31.** *Adoption of N.P.S.,* 868 P.2d 934, 936 (Alaska 1994) (emphasis added).

sound. Accordingly, we AFFIRM the trial court's order terminating Linda's parental rights and finding good cause to deviate from ICWA's preferences in the placement of J.G.