NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| SHELLY S., | ) | |
| | ) | Supreme Court No. S-15591 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-00217 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1529 – February 11, 2015 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Paul E. Olson, Judge.

Appearances: Carolyn A. Perkins, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Appellant. Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her Indian child on the grounds that the trial court erred in finding that active efforts had been made to prevent the breakup of the Indian family and that placing her son in her custody likely

---

\*       Entered under Alaska Appellate Rule 214.

would result in serious harm to him.  Because we see no error in the trial court's decision, we affirm.

## II.    FACTS AND PROCEEDINGS

### A.    OCS Involvement With The Family[1]

Shelly S. has given birth to three children:  Ike, born in 2005; Katie, born in 2006;[2] and Daisy, born in 2009.[3]  All three are Indian children under the Indian Child Welfare Act (ICWA).[4]  This case involves Ike only; Shelly's parental rights to her daughters were terminated in September 2012.[5]

From 2010 through 2012 Shelly was in numerous violent relationships and often drank excessively, requiring police intervention due to her assaultive behavior.  Ike was living with his father but came into custody of the Office of Children's Services (OCS) when his father committed suicide in 2012.  In July 2012 OCS filed an emergency petition seeking temporary custody of Ike as a child in need of aid because Shelly had an open case with OCS regarding the custody of her two daughters and was not making progress in her case plan.  Ike's forensic interview revealed that he had been abused and earlier had witnessed abuse of his sister.  Ike was adjudicated a child in need of aid, and in July 2013 OCS filed a petition to terminate Shelly's parental rights to Ike.

---

[1]     Pseudonyms are used for all family members.

[2]     Katie's father's parental rights were terminated in July 2012.

[3]     Daisy's father signed an adoption consent in September 2012.

[4]     25 U.S.C. §§ 1901-1963 (2012).  Ike's father was a member of the Native Village of Kotzebue, which intervened in the superior court proceedings pursuant to 25 U.S.C. § 1911(c).

[5]     *See Shelly S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1471, 2013 WL 6732880, at *5 (Alaska Dec. 18, 2013).

**B.     The Court's Findings After The Termination Trial**

The trial court found that OCS met its burden with respect to each of the required findings under the Child in Need of Aid (CINA) statutes.  The court found that Ike was a child in need of aid pursuant to AS 47.10.011(6),[6] (8)(B)(ii),[7] (10),[8] and (11)[9] as a result of Shelly's parental conduct.  The court further found clear and convincing evidence that Shelly had not remedied the conduct that put Ike at risk of harm:  she had been dishonest about her relationship and her living situation; she did not understand domestic violence; and she remained in an abusive relationship.  The trial court also found clear and convincing evidence that OCS made active efforts to provide services designed to prevent the breakup of the Indian family, and evidence beyond a reasonable doubt that returning Ike to Shelly likely would result in serious damage to Ike.  Finally, the trial court found that Ike's best interests would be promoted by terminating Shelly's parental rights, freeing Ike for adoption by his foster family.[10]

---

[6]     AS 47.10.011(6) allows a trial court to find a child to be in need of aid if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately."

[7]     AS 47.10.011(8)(B)(ii) allows a trial court to find a child to be in need of aid if "conduct by or conditions created by the parent" place the child at substantial risk of mental injury from exposure to certain criminal conduct by a household member.

[8]     AS 47.10.011(10) allows a trial court to find a child to be in need of aid if the parent's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, which has resulted in a substantial risk of harm to the child.

[9]     AS 47.10.011(11) allows a trial court to find a child to be in need of aid if the parent has a mental illness that places the child at substantial risk of harm.

[10]     Ike's tribe approves of Ike staying with his foster family.

## C.     Shelly's Appeal

Shelly appeals only two of the trial court's findings.  She first asserts that the court erred in finding that OCS made active efforts to prevent the breakup of this Indian family because (1) her case plan included cognitive behavioral therapy (CBT) but OCS failed to refer Shelly to a specific provider who practiced CBT and (2) OCS failed to recommend the specialized parenting education needed to care for a child with multiple diagnoses.[11]   Shelly argues that referrals to proper counseling and to a specialized parenting class would have made a difference because she otherwise complied with the case plan.

Shelly next asserts that the court erred in finding that OCS proved beyond a reasonable doubt that placing Ike with her likely would result in serious emotional or physical damage to him.  Shelly argues that the testimony of OCS's expert witness, Dr. Michael Rose, did not reflect her progress toward completing her case plan because (1) he lacked current information about her and (2) the variables he saw earlier were not present at the time of trial, over a year later.  Shelly also argues that Dr. Rose's testimony was fundamentally flawed because he failed to recommend a specialized parenting class for her to learn to handle Ike's difficult behavioral issues.

## III.   STANDARD OF REVIEW

Whether ICWA's active efforts requirement is satisfied and whether a child likely would be harmed if returned to the parent present mixed questions of law and fact.[12]  We review the trial court's factual findings for clear error and reverse only if left

---

[11]     Ike has been diagnosed with attention deficit disorder and post-traumatic stress disorder, and he has symptoms consistent with attachment difficulties.

[12]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (citing *T.F. v. State, Dep't of Health & Soc.* (continued...)

with "a definite and firm conviction that a mistake has been made."[13]  We use our independent judgment to review questions of law.[14]  Whether the trial court's findings satisfy the requirements of the CINA and ICWA statutes is reviewed de novo.[15]

## IV.  DISCUSSION

### A.    Active Efforts

Before the trial court may terminate parental rights to an Indian child, 25 U.S.C. § 1912(d) and Alaska Child in Need of Aid Rule 18(c)(2) require the court to find by clear and convincing evidence that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.  Courts review the adequacy of OCS's reunification efforts on a case-by-case basis because "no pat formula exists for distinguishing between active and passive efforts."[16]  Active efforts generally entail a social worker taking a parent through the steps of a reunification case plan, rather than simply devising a plan and requiring the

---

[12]     (...continued)
*Servs.*, 26 P.3d 1089, 1092 (Alaska 2001)) (regarding active efforts); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 949-50 (Alaska 2000)) (regarding harm).

[13]     *Maisy W.*, 175 P.3d at 1267.

[14]     *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

[15]     *See Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010) (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[16]     *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

parent to develop the necessary resources.[17]  In determining whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS, rather than focus on a distinct period of time.[18]

The trial court admitted as an exhibit the facts and legal conclusions of the termination trial involving Katie and Daisy.  There the Palmer trial court had based its active efforts finding on a long list of services, including:  providing medical care and therapy referrals for the children; providing learning assessments for the children; submitting Medicaid applications and annual review for the children; providing in-home services; obtaining and paying for mental health counseling; providing family contacts for the parents; facilitating parent coaching; facilitating Shelly's attendance at the children's medical appointments; holding team decision meetings and administrative reviews; paying for and referring Shelly for an evaluation with Dr. Melinda Glass; making contact and referrals for mental health counseling; providing Shelly a referral and paying for comprehensive parenting classes; providing a referral for domestic violence victims' groups; providing referrals to Alaska Family Services for a second comprehensive parenting program and for family support and preservation; providing bus passes; providing in-home services; providing referrals for substance abuse assessments and urinalysis; making efforts to pay for, arrange, and engage Shelly in completing a follow-up psychological evaluation; providing referrals to Cook Inlet Tribal Counsel for a substance abuse assessment; making extensive efforts to place Katie with

---

[17]     *Lucy J.*, 244 P.3d at 1114-15 (affirming trial court's finding that OCS's efforts were exemplary where OCS developed several case plans; made referrals for substance abuse assessments, mental health services, parenting classes, support services, and substance abuse treatment; assisted parent with transportation and finding secure housing; and offered services to children for education and medical needs).

[18]     *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188-89 (Alaska 2009); *Maisy W.*, 175 P.3d at 1268-69.

relatives; arranging 23 meetings; communicating through more than 100 emails and telephone calls related to case planning and encouraging Shelly to engage in services; and having over 450 contacts with Shelly, her father, and various service providers. The court concluded that Shelly's efforts to engage in services were "sporadic at best," while OCS's efforts were "exhaustive based upon [Shelly's] lack of participation." The facts involving Katie and Daisy are relevant to Ike's case because OCS's efforts are not viewed in isolation; rather, if a child is taken into custody when OCS already has custody of the child's siblings, the trial court properly considers all of OCS's efforts from the time it first became involved with the family.[19]

After Shelly's parental rights to her daughters were terminated in late 2012, OCS continued to make efforts to reunify Shelly with Ike. OCS representatives regularly met with Shelly to discuss case plans and treatment; encouraged her to attend a 12-step program and obtain a sponsor; arranged a psychological evaluation by Dr. Rose; gave her a list of mental health resources and assisted her with calling to arrange counseling; and arranged telephone calls and visits with Ike.

"[A] case plan normally should refer parents to appropriate service providers."[20] In this case, however, we conclude that any failure on OCS's part to refer Shelly to specific therapy or parenting classes made no difference in the outcome of the case. The trial court's greatest concerns were Shelly's dishonesty about her relationship and that she remained in an abusive relationship with a man who would not participate in a case plan or domestic violence programs, despite OCS's requests. As the trial court

---

[19] *Sandy B.*, 216 P.3d at 1188-89.

[20] *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1246 (Alaska 2007) (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

stated, the crux of the case was that Shelly had done only what OCS required and had not "effectuated any real change"; her association with abusive partners would likely continue, and she failed to understand and recognize the harm exposure to domestic violence and physical abuse would cause Ike.

Because the record supports the trial court's finding that OCS made active but unsuccessful efforts to reunite this family, we see no error.

### B. Harm To Ike

Before terminating parental rights to an Indian child the trial court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[21] Proving that a parent's custody is likely to cause a child serious harm requires showing that the parent's conduct is (1) likely to harm the child and (2) unlikely to change.[22] The court's finding may be proved through the testimony of one or more expert witnesses or by aggregating the testimony of lay and expert witnesses.[23] OCS's expert testimony does not need to meet the burden of proof standing alone so long as it supports the court's conclusion.[24] The parent's potential for relapsing into substance abuse may be considered in establishing

---

[21] 25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4).

[22] *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950-51 (Alaska 2000) (affirming risk of emotional harm finding when parent repeatedly relapsed).

[23] *Id.*

[24] *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002).

that the child is at substantial risk of suffering mental injury in the parent's care.[25]

The trial court found that OCS proved "beyond a reasonable doubt, including the testimony of Dr. Michael Rose and therapist Leigh Ellen Magness, qualified experts pursuant to [ICWA], that return of the child to [Shelly's] custody is likely to result in serious emotional and/or physical damage to the child." The court pointed to Magness's testimony that Ike "could not return to an environment with domestic violence and that if he did, he would likely suffer increased aggression, self-harming behaviors, poor self-esteem, criminal problems, and difficulty in relationships." And although Dr. Rose testified that he should have recommended specialized parenting sessions for Shelly, the court specifically found that this omission was not a determinative factor in terms of OCS's efforts or Shelly's opportunity to remedy her conduct. Thus it was likely not a determinative factor in the court's finding that returning Ike to Shelly would cause Ike harm. Also, given Dr. Rose's testimony about Shelly's pattern of alcohol abuse and reports of her relapse, the trial court did not clearly err in considering Dr. Rose's opinion that Shelly had not sufficiently demonstrated sobriety for him to consider recommending increased visitation, much less reunification. Nothing precludes the trial court from considering evaluations made months or even years before the termination trial.[26] "[T]estimony about [a] psychological evaluation and [the psychologist's] conclusions at the time of the evaluation fall[s] within the scope of

---

[25]     *See L.G.*, 14 P.3d at 950.

[26]     *See, e.g., Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1254 (Alaska 2010) (concluding trial court could properly rely on doctor's evaluation completed two years before termination trial when hypothetical questions accurately describing case facts were basis for expert opinion).

permissible expert testimony, regardless of when the evaluation was performed."[27]

Other evidence supported the trial court's finding that Ike would likely suffer harm, including Magness's testimony that: Ike's progress would be endangered by placing him where there was domestic violence; if Ike continued to struggle with attachment difficulties, it could lead to trouble at home and school, law enforcement encounters, low self-esteem, self-harming, instability in relationships, and difficulty forming relationships as a teen and adult; and Ike should not be placed with someone who is unable to model stable and appropriate behavior.

Although Shelly clearly had made some efforts to comply with OCS's case plan and had made some improvement, we see no error in the trial court's finding that Ike likely would suffer harm if returned to Shelly.

## V. CONCLUSION

We AFFIRM the trial court's termination of Shelly's parental rights to Ike.

---

[27] *Id.* at 1254 & n.13 ("Such testimony is regularly offered in CINA cases.").