E.M., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.

No. S–7719.

Supreme Court of Alaska.

May 29, 1998.

Elizabeth Page Kennedy, Anchorage, for Appellant.

J. Stefan Otterson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

BRYNER, Justice.

### I.  INTRODUCTION

E.M.'s parental rights to his young son B.M., an Indian child, were terminated on May 28, 1996.  Superior Court Judge Larry D. Card found that B.M. was a child in need of aid (CINA) pursuant to AS 47.10.010(a)(2)(F).[1]  Judge Card then made the necessary findings to terminate E.M.'s parental rights pursuant to AS 47.10.080(c)(3) and applicable provisions of the Indian Child Welfare Act.  E.M. appeals.  We conclude that Judge Card's findings are supported adequately by the evidence and affirm the termination of parental rights.

---

1.  At the time of trial in this case, child in need of aid status was defined in subsections (a)(2)(A)-(F) of AS 47.10.010.  Subsequently, the legislature repealed subsection (a)(1) of the statute; the provisions of subsections (a)(2)(A)-(F) were retained verbatim but were renumbered as AS 47.10.010(a)(1)-(6).  AS 47.10.010(a)(6) is thus the current counterpart of former AS 47.10.010(a)(2)(F).  For simplicity's sake, we will use the former statutory numbering, which governed here.

## II. FACTS AND PROCEEDINGS

B.M. was born on March 18, 1993, to E.M. (father) and L.P.M. (mother). E.M. and L.P.M. were apparently 17 and 16 years old at the time of B.M.'s birth. L.P.M. is a Native Alaskan and a member of the Wales tribe. Accordingly, B.M. is an Indian child and the requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901–03, 1911–23, 1951 (1994), apply to this adjudication.

B.M. was first brought to the attention of the Division of Family and Youth Services (DFYS) when he was 13 days old, and intensive in-home parenting services were provided for E.M. in July of 1993 (evidently L.P.M. was in California). B.M. was removed from E.M.'s custody on August 31, 1993, because E.M. left B.M. with an aunt and never returned to pick him up. B.M. was placed in the legal custody of DFYS, but E.M. was allowed to resume physical custody. After B.M. was placed back in E.M.'s physical custody, DFYS instituted a case plan that included home visits, the AFFECT program, a public health nurse, and parenting classes, drug screening, and urinalysis for both parents.

B.M. was again removed from E.M.'s custody on March 30, 1994, and has not been returned to either of his parents' custody since that time. Corinne Bryant, the DFYS social worker assigned to B.M.'s case at the time of his removal, asserted that the culmination of a number of different factors, including the child being left alone, reports of danger to the child from people in E.M.'s home, and E.M.'s failure to follow the DFYS treatment plan, led to the removal. In June 1994, Superior Court Judge Peter A. Michalski found that B.M. was a child in need of aid pursuant to AS 47.10.010(a)(2)(A) and (F).[2]

A new DFYS case plan, similar to the old one but with a requirement of consistent visitation of B.M., was prepared on July 26, 1994. On September 13, 1994, Judge Michal-ski issued a disposition order placing B.M. in the State's physical custody and directing E.M. to comply with the DFYS case plan. The judge noted that DFYS had indicated that it would move to terminate parental rights if there was not substantial compliance with the DFYS case plan within 30 days. He also specifically ordered E.M. to

a. Follow through on the out-patient treatment that was recommended by the Salvation Army Clitheroe Center [and] continue to do bi-weekly urine analysis. b. Obtain a psychological evaluation if separately ordered by the court, and follow all recommendations [ (evaluation was ordered November 23, 1994) ]. c. Enroll in and complete parenting classes. d. Enroll in and complete the Male Awareness Program. e. Visit the child regularly.

These directives appear to be based on recommendations of DFYS and the guardian ad litem, E. Genivee Bettine.

DFYS subsequently concluded that E.M. had refused to comply with his case plan. In January 1995, the agency filed a petition for termination of E.M.'s parental rights, alleging that the circumstances justifying the original CINA determination still existed.

E.M.'s termination hearing originally was scheduled for April 1995 but was continued at the last minute because E.M. scheduled a psychological evaluation for himself, and DFYS wanted to wait for the results. The hearing was reset for October 11, before Judge Card. Judge Card heard evidence on October 11, 12, and 17; he then recessed proceedings for several months and concluded the hearing on March 12 and 13 of 1996.

At the hearing, DFYS produced evidence showing that E.M. had made little effort to comply with his case plan, had maintained minimal contact with B.M., and had not progressed in his ability to provide B.M. a safe and stable home. On May 28, 1996, Judge Card issued an order finding that B.M. was a child in need of aid under AS

---

2. At the time of this adjudication, AS 47.10.010(a)(2)(A) provided that the court could find a minor to be a child in need of aid as the result of the child "having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by ... both parents." Subsection (F) provided that "the child having suffered substantial physical abuse or neglect as a result of the conditions created by the child's parent" would justify a CINA finding.

47.10.010(a)(2)(F) by virtue of parental negligence and terminated both L.P.M.'s and E.M.'s parental rights pursuant to AS 47.10.080(c)(3).[3]

E.M. appeals. "

## III. DISCUSSION

### A. Standard of Review

■■■ This court applies the clearly erroneous standard when reviewing a trial court's factual findings concerning the termination of parental rights. See In re S.A., 912 P.2d 1235, 1237 (Alaska 1996). A trial court's findings will be declared clearly erroneous if this court, after a review of the entire record, is left with a definite and firm conviction that a mistake has been made. See id. However, a determination of whether the trial court's findings comport with the requirements of the CINA statutes and rules involves a question of law and accordingly will be reviewed de novo. See R.J.M. v. State, 946 P.2d 855, 861 (Alaska 1997); R.R. v. State, 919 P.2d 754, 755 n. 1 (Alaska 1996); Langdon v. Champion, 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

### B. Statutory Framework

The statutes and rules governing termination of parental rights require a number of determinations. Under AS 47.10.080(c)(3), termination is authorized

upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid [CINA] under AS 47.10.010(a) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights.

See also CINA Rule 15(c).

Pursuant to this statute, the court first determines if there is clear and convincing evidence for a CINA adjudication based on one of the six grounds stated in AS 47.10.010(a)(2)(A)-(F). See Nada A. v. State, 660 P.2d 436, 439–40 (Alaska 1983). Then the court determines, still using the clear and convincing evidence standard, whether the

child is in need of aid because of parental conduct and whether the parental conduct is likely to continue if parental rights are not terminated. See id. at 440; A.M. v. State, 891 P.2d 815, 819 (Alaska 1995), overruled in part by In re S.A., 912 P.2d at 1241.

In cases involving removal of a child from the home, CINA Rule 15(g) further requires the court to find that "reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return to the home." See also 42 U.S.C. § 671(a)(15) (1994) (requiring State plan for foster care and adoption assistance to include reasonable efforts to keep the child in his home in order for the State to receive AFDC payments). A more stringent requirement applies under ICWA in cases involving Indian children. See 25 U.S.C. § 1912(d) (incorporated in CINA Rule 17(c)(2)). Under ICWA, before removing an Indian child from parental custody, the court must find by a preponderance of the evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Id.; see also CINA Rule 17(c)(2).

In addition, ICWA requires that, before terminating parental rights in a case involving an Indian child, the court must find "beyond a reasonable doubt, including the testimony of qualified expert witnesses, that custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (incorporated in CINA Rule 18(c)(2)).

Last, in all children's proceedings involving disposition orders entered under AS 47.10.080(c), including proceedings for the termination of parental rights, AS 47.10.082(1) explicitly requires the court to consider the best interests of the child. See Nada A., 660 P.2d at 439–40.

### C. The Superior Court Applied the Proper Legal Standards and Its Findings Are Supported by the Evidence.

In his oral findings and written order terminating E.M.'s parental rights to B.M.,

---

3. L.P.M. did not contest the termination of her parental rights.

Judge Card stated that B.M. "was shown to be a child in need of aid pursuant to AS 47.10.010(a)(2)(F) by clear and convincing evidence on this date as a result of ... parental conduct." Judge Card also determined that "[t]here is clear and convincing evidence that the parental conduct which caused [B.M.] to be a child in need of aid is likely to continue if the parental rights of [E.M.] are not terminated."

The judge went on to say:

I find that there is evidence beyond a reasonable doubt, based on the expert testimonies submitted, that the custody of [B.M.] by either parent is likely ... to result in serious emotional or physical damage. I would note that the physical damage issue is more or less direct than the issue of emotional [damage].

Judge Card further found "by a preponderance of the evidence [that] there have been active efforts to provide remedial services to both these parents, and they have proved unsuccessful as of today's date." In connection with this finding, the judge emphasized that DFYS had made "huge[,] almost embarrassing efforts" to provide assistance to E.M. and L.P.M.

■ E.M. challenges the sufficiency of the evidence to support these findings. However, our review of the evidence convinces us that the findings are amply supported and are not clearly erroneous.

The testimony of Corinne Bryant, the social worker who had B.M.'s case at the time of his permanent removal, Bettine, B.M.'s guardian ad litem, and Renee Pagel, E.M.'s friend and the grandmother of another one of E.M.'s children, supports Judge Card's finding that B.M. continued to be a child in need of aid under AS 47.10.010(a)(2)(F) by virtue of parental neglect.[4]

Corrine Bryant explained the events and conduct leading up to B.M.'s permanent removal in a pre-disposition report issued on August 25, 1994, and in her testimony at trial. Bryant asserted that the house was a mess and unsafe for a child when she visited it; there were dangerous people in and out of the house and some of them had threatened and attacked E.M. while B.M. was present; E.M. wanted to buy a gun and leave the state for protection; E.M. would not follow through with substance abuse treatment or day care suggestions and was belligerent about those topics; in March 1994, just before the removal, E.M. was missing appointments with the public health nurse and B.M. appeared to be losing weight; and E.M. would not listen to suggestions concerning the care of B.M.[5]

Bettine's Guardian ad Litem report confirmed Corinne Bryant's observations. In addition, Bettine testified that on one of her visits to E.M.'s residence, she found that B.M., then an infant, had been left at home alone.

Renee Pagel testified that when B.M. was in E.M.'s custody prior to his removal to State custody by DFYS, he was left alone on a number of occasions; on other occasions, he was left in the care of anyone who happened to be present in E.M.'s apartment. Pagel also described one occasion of domestic violence between E.M. and L.P.M. that involved E.M.'s use of a knife.

Moreover, the court heard abundant evidence indicating that, since his son's removal, E.M. had made little or no progress in attempting to meet the requirements of his court-ordered case plan. Dr. James Harper

---

4. Recently, in *R.J.M. v. State*, 946 P.2d 855, 862–68 (Alaska 1997), we held that CINA jurisdiction pursuant to AS 47.10.010(a)(2)(F) cannot be based solely on emotional neglect. We construed "neglect," as used in subsection (F), to mean physical neglect. *See id.* at 867. Judge Card's finding of neglect under subsection (F) does not differentiate between physical and emotional neglect. However, E.M. does not claim that his CINA adjudication was improperly based on emotional neglect. And Judge Card's findings as a whole make it clear that his primary focus was on the potential physical risk to B.M. Two

especially noteworthy points in this regard are Judge Card's finding beyond a reasonable doubt, in compliance with 25 U.S.C. § 1912(f), that B.M. would face imminent harm if returned to E.M. and Judge Card's observation "that the physical damage issue is more or less direct than the issue of emotional [harm]."

5. Bryant also noted in her "Report for Child in Need of Aid" that in mid-November of 1993, E.M. served 10 days in jail for putting an unloaded gun to a person's head.

performed a psychological evaluation of E.M. in April 1995, shortly before E.M.'s originally scheduled termination hearing. Dr. Harper's testimony and initial report supports the State's assertion that E.M.'s unstable conduct is likely to continue and that B.M. will likely be harmed if he is returned to E.M.

Dr. Harper reported that he did "not believe that [E.M.] can parent his son effectively at the present time." Additionally he observed "I do not believe that [E.M.] sees a need or is willing to acknowledge his shortcomings, so I am not optimistic [that] treatment would be helpful at this time." At trial, after being informed of E.M.'s most recent living situation, Dr. Harper testified that "I think [E.M.] is much more impulsive, continues to choose peers who are less than desirable, [and] is not benefitting from experience the way other young adults do."

This assessment was also supported by Brunhilde Eska, a DFYS social worker who had worked on E.M.'s case and testified as an expert witness. Eska agreed with Dr. Harper's negative assessment of E.M.'s potential, stating that she had found "no progress whatsoever, not even more stability." Eska testified that, since his psychological evaluation, E.M. had not followed Dr. Harper's recommendations; Eska also established that Dr. Harper's recommendations were essentially the same as the original DFYS case plan, which had been in place for a year and two months prior to Dr. Harper's evaluation.

Further, according to Eska, DFYS records indicated that E.M. had visited B.M. only six times between August 1995 and March 1996. And although E.M. eventually met the case plan's requirement of completing a parent training class, he had never met the plan's requirement of completing a Male Awareness Program and had consistently failed to submit to regular urinalysis testing.[6]

Eska expressed the general opinion that E.M. was "still not ... putting [B.M.'s] welfare and interest ahead of [his] own," and that E.M. would not be able to provide a safe home for B.M. Indeed, Eska's testimony raised concerns as to whether E.M. was even capable of providing a stable home for himself: she testified that throughout most of the time she had the case, E.M. had failed to disclose where he lived and had given her no address where he could be contacted. Eska thought that if B.M. were returned to E.M., the child would probably end up back in DFYS custody.

Echoing these concerns, Renee Pagel testified that, since B.M.'s removal to DFYS custody, E.M. had been living in an apartment with many other people: "there was guys, [sic] girls, there were some runaway [sic]"; the apartment was overcrowded and unclean, and there were alcohol bottles about the place. E.M. was eventually evicted. The eviction complaint alleged that he had numerous people staying with him, including three small children, in very unsanitary conditions.[7] According to Pagel, in July 1995, E.M. was involved in an altercation in which he was "a little loaded and he swung at [someone]." Gregory Baker, a detective for the Municipality of Anchorage, also testified that E.M. was involved in a shooting incident in July 1995. E.M. lost his job after these incidents.

Given the foregoing evidence, Judge Card's factual findings are not clearly erroneous.

### D. The Superior Court Did Not Err as a Matter of Law on the Basis Used to Terminate E.M.'s Parental Rights.

E.M. nevertheless challenges the superior court's legal conclusion that termination of parental rights was justified in this case. E.M. alleges that the court's finding of neglect was based merely on Judge

---

**6.** Eska summed up the efforts DFYS put into remedial services and rehabilitative programs as follows:

> We—DFYS offered every and any services they could think of. They referred them to counseling, to the MAP program, to UA's, they made money available, we requested bus passes, which were never picked up, we arranged for

visits, anything we could think of to make it possible for [B.M.] to be returned to the custody of his parents.

**7.** In his briefs on appeal, E.M. acknowledges that he had no money and was homeless at periods of time after B.M. was removed.

Card's belief that E.M. was not getting his life together fast enough and that B.M. simply could not afford to wait any longer. E.M. criticizes Judge Card for basing his termination decision on B.M.'s best interests, asserting that the child's interests are not included among the statutory criteria governing termination of parental rights. This assertion is incorrect. Alaska Statute 47.10.082(1) explicitly requires the court to consider the best interests of the child in all dispositions under AS 47.10.080(c), including the termination of parental rights. *See* AS 47.10.082(1); *Nada A.*, 660 P.2d at 439–40.

E.M. further asserts that termination of his parental rights is unjustified because he has never actually injured B.M. E.M. implicitly asserts that without actual injury, there can be no neglect. This assertion is incorrect as well. We see no reason that a finding of neglect cannot be based on conduct creating an imminent risk of serious injury. Here, the trial court properly focused on the risk of future harm to B.M., rather than on the infliction of past injury.

## IV. CONCLUSION

In deciding to terminate E.M.'s parental rights, Judge Card essentially found that, despite assiduous remedial efforts by DFYS over a two-year period, E.M.'s continuing failure to stabilize his own life would almost certainly render him incapable of providing B.M. a safe and stable home in the foreseeable future. Judge Card's decision is both factually supported and legally sound.[8] Accordingly, we AFFIRM the order terminating E.M.'s parental rights.

8. E.M. has separately argued that the superior court erred in allowing the State to amend its witness list after E.M. moved for a directed verdict near the conclusion of the State's case-in-chief. Trial courts have broad discretion in ruling on such issues. *See Wright v. Vickaryous*, 598 P.2d 490, 495 (Alaska 1979). Our review of the record discloses neither an abuse of discretion nor resulting prejudice to E.M.