**v.**

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.**

No. S–9817.

Supreme Court of Alaska.

Feb. 15, 2002.

Alex Koponen, Fairbanks, for Appellant.

D. Rebecca Snow, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Vivian [1] appeals the termination of parental rights over her four children. She has been diagnosed with Bipolar Disorder, which had previously made effective parenting difficult. The State asserts, and Superior Court Judge Mary E. Greene agreed, that despite the fact that Vivian is now stabilized on medication for her mental illness, she is still unfit to serve as an adequate parent for her four children, all of whom exhibit psychological and/or developmental difficulties that require special attention. Because all four children at issue are Indian children, the standards of proof required by the Indian Child Welfare Act (ICWA) apply. While Vivian made significant efforts at rehabilitation, the superior court adequately examined the record and applied the correct standards of proof in determining that it was in the best interests of the children to terminate Vivian's parental rights. Consequently, the decision of the superior court is affirmed.

## II. FACTS AND PROCEEDINGS

### A. Parties at Issue

Vivian, the appellant, is the mother of the four children (Scott, Amy, Michael, and Veronica) in dispute. Keith, who had been involved in the Division of Family and Youth Services (DFYS) action and in the action in the superior court, is the father of Scott, Amy, and Michael; the father of Veronica is deceased. Both Vivian and Keith had their parental rights terminated in superior court by Judge Mary E. Greene on August 29, 2000. Vivian has appealed this decision; Keith has not.

### 1. Vivian

Vivian has suffered from a long history of mental illness. The condition from which she suffers is Bipolar Disorder, for which she is currently taking medication to control her symptoms. Her first acute attack was precipitated by taking LSD in 1988 when she was fifteen and resulted in her being hospitalized, first in the Fairbanks Memorial Hospital and then in the Alaska Psychiatric Institute. Subsequent hospitalizations for mental illness have coincided with the births of each of her four children. The first such hospitalization occurred at the Alaska Psychiatric Institute in October 1991, shortly after the birth of her son Scott. Vivian had ceased taking her medication for her mental illness in November 1990. Fearing that Vivian might not be able to care for her baby because of her psychological condition, the obstetrician both requested a psychiatric consultation and contacted DFYS. Vivian was sent to the Alaska Psychiatric Institute and later given lessons in child care.

In 1992 Vivian was hospitalized in the psychiatric ward of Fairbanks Memorial Hospital while making accusations that Scott was being sexually molested. Approximately six months after the birth of Amy in June 1993, Vivian was again sent to the Alaska Psychiatric Institute and the psychiatric ward of Fairbanks Memorial Hospital. Upon the insistence of Keith, Vivian discontinued use of her prescribed psychotropic medications during her pregnancy, thus precipitating the recurrence of acute episodes related to her Bipolar Disorder. Vivian had another acute episode in 1994. As of September 1995, Vivian was again pregnant (with Michael) and off her medication at the insistence of Keith.

Vivian left Keith in April 1996, took her three children to a local women's shelter, and filed a domestic violence restraining order against Keith. After becoming pregnant with Veronica by a now-deceased third party, Vivian reconciled with Keith. Vivian soon thereafter filed a second protective order against him when he ordered her and her sister out of his house. This second petition was filed in response to a domestic violence incident in which Keith allegedly grabbed Vivian and threatened to kill her after she kicked him in the nose during an argument. Despite leaving Keith, Vivian did not take

1. Pseudonyms have been used throughout this     opinion for all family members.

her mental illness medications during her pregnancy. Soon after the birth of Veronica on October 6, 1997, Vivian asked her mother to take care of her children while she had a tubal ligation.

In January 1998 Vivian was arrested for assaulting her niece, who at the time was babysitting the children.[2] At the time, all four children were living with Vivian, but only the three older children were present during the assault, Veronica having spent the night with her maternal grandmother. Upon her release from jail, Vivian went again to the Alaska Psychiatric Institute and then in April 1998 entered the Paul Williams House, an assisted living facility in Fairbanks for patients with mental illness. The Paul Williams House does not allow its patients to have children live with them. Vivian left the Paul Williams House in September 1999 and a month later moved in with Craig, whom she married the following month.

### 2. The children

Scott, the oldest child, was almost nine at the time of the superior court trial. He suffers from both Attention Deficit/Hyperactivity Disorder and Post Traumatic Stress Disorder. Scott displays aggressiveness toward other children and poor communications skills. In addition, he has serious psychological issues surrounding sex: He has been both a victim and a perpetrator of sexual abuse. Vivian reports that Scott told her that he had been sexually assaulted by his father. Scott has been sexually active on frequent occasions, including sexual intercourse with a ten-year-old girl when he was four years old and sexual intercourse with a fifteen-year-old female cousin when he was six. Scott is considered a threat to other children and has already sexually assaulted both another boy and his younger sister Amy. Scott was frequently beaten as a child. In therapy sessions, Scott described incidents of fighting between Vivian and Keith,

including Keith raping Vivian and sending her to a friend to be raped.

Scott is currently in foster care. He was initially placed with his maternal grandparents, but later removed after the grandparents violated rules about contact between Scott and Vivian. All four children, including Scott, were placed for one night in an Indian preference foster home but were removed because the prospective foster parents did not feel they could handle children with such severe disciplinary problems. Social workers feared Scott would be a difficult foster placement because of his behavioral problems. However, Scott was quickly placed with his current foster family, to whom he appears to have developed some attachment and who have expressed a desire to adopt him. The family is non-Native. Social workers who worked with Scott testified that he needs to be placed in a caring and supportive environment, with only limited visitation with his parents, if he is to develop into an emotionally well-functioning adult. Scott has expressed some desire to visit with his mother and siblings.

Amy, seven years old at the time of trial, also exhibits behavioral problems as a result of being a victim of sexual abuse. She has a history of masturbating excessively in front of family members. She has been sexually molested by Scott. A child psychiatrist has also testified that Amy is physically aggressive with other children and has difficulty establishing appropriate physical boundaries. Amy is emotionally immature and has developmental difficulties with regard to her social interactions. Furthermore, she has Fetal Alcohol Effect and probably suffers from Attention Deficit Disorder.

Social workers have testified that Amy will need significant parental attention, in addition to continued therapy, if she is to overcome her developmental difficulties. Amy is currently in foster care with a non-Native family that has expressed a desire to adopt her.[3] This is her third foster family, the first

---

**2.** Vivian alleges in her brief that the niece had sexually abused the children and that Vivian was just defending them. Vivian previously testified, however, that she does not remember why she got into a fight with her niece.

**3.** Vivian did not challenge the placement of Scott and Amy with non-Native families. The trial court found that good cause existed in both instances for deviating from ICWA placement preferences. *See* 25 U.S.C. § 1915(a).

foster family having had Amy for only one night and the second declining to adopt Amy after having her for eleven months. Amy appears to have formed an emotional attachment to her current foster family. In therapy sessions following visits by Vivian, Amy has also expressed a desire to stay with Vivian.

Michael, who was four years old at the time of the trial, exhibits hyperactivity and self-destructive behavior. He has shown developmental delays in his speech and behavior. Michael also throws violent temper tantrums and is aggressive toward other children. His therapist believes Michael suffers from Post–Traumatic Stress Disorder and Reactive Attachment Disorder, but has ruled out Attention Deficit/Hyperactivity Disorder. Michael has trouble sleeping at night, including uncontrolled bouts of screaming, and is on medication for his sleeping difficulties. Michael needs near-constant attention to ensure he is not a danger either to others or to himself. Michael is currently placed with a Native American foster family to whom he has gained some limited form of attachment; he shows overall improvements in his behavior. He has lived in multiple foster placements. Michael's current foster family has expressed a desire to adopt him.

Veronica was only two and a half years old at the time of trial. She suffers from a pronounced case of Fetal Alcohol Syndrome, including both physical and mental manifestations. She exhibits various developmental delays and will need continued therapy for the foreseeable future. Veronica was initially placed with relatives, but permanent adoption was not possible because the specialized resources she needed were not available in the area. Veronica is currently with an Alaska Native foster family who has expressed an interest in adopting her. Veronica was initially a rather aggressive child and displayed self-destructive behavior but following her foster placement is able to get along better with other children. Her development has almost caught up to that of a normal two year old.

## B. Procedural History

DFYS took emergency custody of Scott, Amy, and Michael on December 19, 1997, with a petition for temporary custody filed two days later and granted on January 13, 1998 (retroactive to December 21, 1997). A petition for adjudication of a child in need of aid was filed for these three children on February 24, 1998. DFYS took emergency custody of Veronica on May 11, 1998 from her maternal grandmother, with whom all four children had been placed by DFYS, and filed a petition for adjudication the following day.

Vivian signed a stipulation for adjudication and disposition covering all four children on June 1, 1998. This stipulation laid out a three-phase plan whereby she could work toward regaining custody of her children. The first phase of the stipulation required that Vivian remain in the Paul Williams House, meet regularly with her case manager and therapist, and remain on her recommended medications. The second phase stated that after Vivian "has been sufficiently stabilized in her mental health treatment program" and received a substance abuse evaluation and appropriate treatment, DFYS would begin to arrange visitation with the children in consultation with each child's counselor. If Vivian maintained stable mental health and completed the recommended substance abuse treatment, DFYS would, in phase three, refer her to parenting education programs with the goal of teaching Vivian the necessary parenting skills to be a capable mother. As the children began spending more time with Vivian, the parenting education would be arranged in-home and tailored to the specific needs of each child. Keith signed this stipulation on June 2, 1998, with similar requirements on his part if he were to be reunited with his children.

Based upon the facts agreed to in the stipulation, the court entered its findings and order of adjudication and disposition based on stipulation on June 15, 1998, committing all four children to the custody of DFYS for a period "not to exceed one year" from June 2, 1998. DFYS filed a petition for termination of parental rights on May 17, 1999. State custody over the children was extended through the end of the trial, as the trial could not be completed before the June 1 date.

A series of delays pushed back the date of the trial. Trial had initially been scheduled for November 1999. In a contested permanency hearing on December 3, 1999 the trial court found the continued foster placements of the children to be in their best interests. A conflict of interest with her first attorney forced the court to appoint a new attorney for Vivian, postponing the trial until February 2000. Just before trial was to begin, the Native Village of Buckland granted membership in their tribe to Vivian and all of her children and intervened in the case, forcing the trial to be postponed for another month.[4] The trial finally took place over sixteen days between March 22 and June 22, 2000. On July 28, 2000, Judge Greene presented her decision orally, followed by written findings and order on August 29, 2000. Vivian appealed on September 19, 2000.

## III. STANDARD OF REVIEW

■■■ The Alaska Supreme Court will not reverse a trial court's factual findings in a parental rights termination case unless those findings are "clearly erroneous."[5] This standard is met if this court is "left with the definite and firm conviction that a mistake has been made."[6] The issue of whether or not the trial court's findings satisfy the requirements of the child in need of aid (CINA) statutes is a question of law that is reviewed de novo.[7]

## IV. DISCUSSION

### A. The Arguments in Vivian's Brief Were Not So Cursory as to be Waived.

■■■ The State asserts that Vivian's brief treats the points of appeal in a cursory fashion and that those points should therefore be waived. More specifically, the State points to the fact that Vivian does not cite a single case in the brief and cites to only two federal statutes, failing there to mention the relevant related Alaska statutes. The State further alleges that Vivian's brief, the discussion section of which covers only four pages, contains only minimal exposition of its arguments. Finally, the State claims that Vivian's brief "lack[s] serious discussion of the evidentiary basis for her contentions."

While the State may be correct in its assertion that Vivian's brief is rather poorly constructed, the quality of the brief does not merit a determination that its points on appeal should be waived. Although Vivian's brief does not cite any cases in support of its arguments, it does provide an evidentiary basis for its argument. We thus conclude that the treatment of the issues is not so cursory that we should decline to consider the points on appeal.

### B. The Superior Court Correctly Found that the Four Children Are Children in Need of Aid.

Before termination proceedings can be conducted, the superior court must determine that the children are children in need of aid under Alaska law.[8] Vivian challenges the determination that the four children are children in need of aid. However, in the stipulation agreement signed by Vivian, she admitted that the children are children in need of aid.[9] Vivian claims that the conduct placing the children in danger was committed by

---

4. The Native Village of Buckland did not request a transfer of jurisdiction over the foster placement or termination proceedings. *See* 25 U.S.C. § 1911(c) ("In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.").

5. *H.C. v. State, Dep't of Health & Soc. Servs.,* 956 P.2d 477, 481 (Alaska 1998).

6. *E.A. v. State,* 623 P.2d 1210, 1212 (Alaska 1981).

7. *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000).

8. AS 47.10.088(a)(1)(A); CINA Rule 18(c)(1)(A).

9. The conditions admitted to were those under then-AS 47.10.010(a)(6) (since amended in 1998), which covered physical abuse and neglect. It is unclear if Vivian is asserting that the children were *never* abused or neglected. Rather, she may be asserting only that the children presently would not be at risk of harm if placed with her.

Keith and not by Vivian.[10] However, the findings by the trial court do not support this conclusion.

The trial court found five bases for determining that the four children fell under the Alaska CINA statutes.[11] Indeed, Judge Greene stated that "[t]hese children are among the most damaged children" she had seen in twenty-five years "practicing in the area of children's law." If the findings and evidence are legally sufficient to satisfy any one of these five alternative requirements, the termination will be affirmed.[12] The appropriate standard of proof is the "clear and convincing evidence" standard.[13] Although the trial court did not explicitly say so, it implicitly found that this standard was satisfied by expressly stating, after setting out its CINA findings, that "[t]he court further finds that there is evidence *beyond a reasonable doubt* that each of these children would be likely to suffer serious physical and especially emotional damage if placed in the custody of either parent." (Emphasis added.) In context, this finding, though made under ICWA, effectively subsumes the required state law CINA findings. Whether the trial court's findings comport with CINA requirements is a question of law and accordingly reviewed de novo.[14] We find that the record clearly supports the conclusion that Vivian, through her actions and inaction, caused the children to suffer harm in three ways (mental injury, sexual abuse, and substantial risk of physical harm). Accordingly, we do not reach the issue of whether the other two statutory findings were clearly erroneous.

■ First and foremost, the children are children in need of aid under AS 47.10.011(8)(A) because they have suffered "mental injury" as a result of "conduct by or conditions created by the parent." The severe mental injuries are detailed in the earlier discussion of the various psychological problems each of the four children faces.[15] These injuries have been confirmed by multiple therapists and social workers. Each child has different psychological problems, though tendencies toward aggressive behavior are common in all four. It appears clear that the mental injuries suffered by each of the children have been caused or at least exacerbated by living with Vivian. In short, there is ample evidence of mental injury to justify bringing each child into state custody.

■ Secondly, the sexual abuse experienced by Scott and Amy makes them children in need of aid under AS 47.10.011(7). The trial court made special note of the fact that Vivian expressed concern that her children were being sexually abused and yet did not take any steps to protect them, nor did the children view her as someone who would protect them. No efforts were made to protect Amy from Scott. The trial court notes that parental neglect of the children contributed to the creation of this situation. Vivian alleges that Scott told her that he was sexually abused by Keith. Yet, she did little to prevent a recurrence in the future.[16] Due to the sexual abuse they have suffered and the absence of steps by Vivian to prevent this abuse, Scott and Amy are children in need of aid.

■ Finally, Scott, Amy, and Michael suffered "substantial physical harm" or were

10. Vivian further asserts that DFYS should have placed the children in her care once it learned that she had remarried into a stable home environment. This issue is relevant to the issue of Vivian's rehabilitative efforts but not to the determination of the child in need of aid status of the children.

11. These bases were AS 47.10.011(6) (substantial risk of physical harm); AS 47.10.011(7) (sexual abuse); AS 47.10.011(8)(A) (mental injury to the child); AS 47.10.011(9) (neglect); and AS 47.10.011(11) (mental illness of the parent contributing to a risk of harm to the child).

12. *See A.H. v. State, Dep't of Health & Soc. Servs.,* 10 P.3d 1156, 1161 (Alaska 2000); *A.B. v. State,* *Dep't of Health & Soc. Servs.,* 7 P.3d 946, 951 (Alaska 2000).

13. AS 47.10.011.

14. *E.M. v. State, Dep't of Health & Soc. Servs.,* 959 P.2d 766, 768 (Alaska 1998) (citing *R.J.M. v. State,* 946 P.2d 855, 861 (Alaska 1997)).

15. *See supra* Part II.A.2.

16. Vivian did at one point take the children to a women's shelter and has filed for protective orders against Keith but she subsequently allowed the children to live with him.

placed at risk of "substantial physical harm" while in the home and as such can be considered children in need of aid under AS 47.10.011(6). Vivian admits to "spanking" the children and Scott related to a therapist an incident in which Vivian "punched" him for no reason.[17] Scott also related having to protect his mother from his father. Scott, Amy, and Michael were all exposed to fighting between Keith and Vivian. Keith testified that he feared Vivian would hurt the children, though he never did see her actually hit the children. All of these establish by clear and convincing evidence that the children had experienced or were at risk of experiencing "serious physical harm" from Vivian prior to being taken into custody by the State.

### C. The Superior Court Correctly Found that the Parental Rights of Vivian Should Be Terminated.

Because Vivian and each of her children were members of the Native Village of Buckland, the standards of proof established by ICWA at 25 U.S.C. § 1912 apply to proceedings for the termination of parental rights. The key subsections for the present case are: § 1912(d),[18] establishing a preponderance of evidence standard for demonstration that remedial services and rehabilitative programs have been provided and proven unsuccessful;[19] and § 1912(f),[20] establishing a beyond

a reasonable doubt standard for termination of parental rights.

**1. § 1912(f)**

Vivian does not appear to challenge the validity of the trial court's findings under § 1912(f) and AS 47.10.088, despite the relatively high "beyond a reasonable doubt" standard of proof imposed on the State.[21] The trial court did not explicitly address the requirements of either § 1912(f) or AS 47.10.088, but did find that "there is evidence beyond a reasonable doubt that each of these children would be likely to suffer serious physical and especially emotional damage if placed in the custody of *either* parent." The trial court then proceeded to rely upon expert testimony to support its decision terminating parental rights. Thus, the trial court satisfied ICWA with regard to the termination of parental rights. A review of the record leads us to conclude that this finding is not clearly erroneous.

In finding beyond a reasonable doubt that each child "would be likely to suffer serious physical and especially emotional damage if placed in the custody of either parent," Judge Greene cited both the lack of an emotional connection between the children and their mother and the harm that would be done to the children by moving them out of their current foster families. This finding is based not solely on Vivian's history of mental illness but also on the "flat

---

17. Scott did not clearly distinguish here between his mother and stepmother, stating only that his "mom" punched him. The superior court appears to have interpreted this as a reference to Vivian, which was also the impression of the social worker.

18. 25 U.S.C. § 1912(d) states:
   Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

19. *K.N. v. State,* 856 P.2d 468, 476 (Alaska 1993).

20. 25 U.S.C. § 1912(f) states:
   No termination of parental rights may be ordered in such proceeding in the absence of a

determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

21. Because the children are Indian children, the State must satisfy the "reasonable doubt" standard established by ICWA, 25 U.S.C. § 1912(f). The procedures for termination of parental rights are set forth in AS 47.10.088(a)(1)(B) and require, in pertinent part, that

   the parent (i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or (ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.

affect" with which she treats her children.[22] Consequently, the superior court found that it was in the best interests of the children to terminate Vivian's parental rights.

■ The abuse, both sexual and physical, suffered by Scott is so traumatic that he would suffer emotional damage by being returned to Vivian. Scott refuses to talk about Vivian or Keith in therapy. Past emotional damage makes it highly unlikely that Scott will form a healthy emotional attachment to Vivian. A child psychiatrist concluded that Scott would regress to his previous behavior if returned to either one of his parents. Furthermore, Scott needs to be in a family where the parents understand how to respond to his oversexualized behavior; it is doubtful that Vivian could do this, whereas his current foster family has shown some progress in this regard.

■ A social worker testified that Amy would be "devastated" by being moved out of her stable and supportive foster home to live with either of her parents, neither of whom understand Amy's emotional needs or can provide a loving environment. Amy no longer trusts Vivian to take care of her. Amy could lose the behavioral strides she has made if placed back in an environment where she does not trust her parents. Amy also has complicated emotional problems and needs that would be difficult for Vivian to address.

■ Michael also needs special parenting skills to help control his aggressive tendencies. This is best achieved by a stable home environment. His self-destructive behavior requires that he be monitored almost continuously. Michael has been unable to form an emotional attachment to his mother. Michael would be destabilized by any move, but especially by being placed with one of his parents.

■ Veronica, because of her Fetal Alcohol Syndrome, requires special treatment that Vivian would not be able to provide. Veronica has no emotional attachment to her mother. She needs to be placed in a supportive environment if she is to have continued healthy emotional development.

Vivian alleges that the trial judge erred in finding that expert parenting skills were required to handle the children.[23] This is not an entirely fair characterization of the trial court opinion, which states that while Vivian is indeed correct that testimony exists suggesting the need for a "far better than average parent," this does not necessarily imply a particular expertise. As the State admits, none of the foster parents possess particular training or skills in addressing the special needs of these children. The trial court found, rather, that the combination of the developmental difficulties experienced by the children with the negative feelings they have for their parents would overwhelm the ability of either parent to meet the needs of the children and cause the children to feel inse-

**22.** Mental illness, absent related conduct, cannot be a basis for termination of parental rights. *In re J.W.*, 921 P.2d 604, 607 (Alaska 1996) (citing *K.N. v. State,* 856 P.2d 468, 475 (Alaska 1993) and *Nada A. v. State,* 660 P.2d 436, 440 (Alaska 1983)). However, when continued mental illness is linked with past detrimental behavior, it can serve as a basis for termination of parental rights. *J.W.*, 921 P.2d at 608 (citing *K.N.,* 856 P.2d at 475). Vivian's illness has resulted in repeated hospitalizations that have restricted her ability to care for her children. Vivian left Veronica with Vivian's parents, even though she later acknowledged that they were too old to care for a small baby. This placed Veronica at risk of physical harm or mental injury. Furthermore, the acute episodes of Vivian's Bipolar Disorder, due to ceasing to take her medications while pregnant, resulted in periods of decompensation that led to some of the domestic violence incidents with Keith, thus placing the children in

further danger. Because Vivian is now taking medication for her mental illness, there is a possibility that she will not in the future have any more psychotic episodes. However, it was not improper for the trial court to recognize this as a risk. Vivian's mental illness, when coupled with her past actions, is such that she cannot regain custody of her children without likely causing them continued mental injury. Furthermore, removal from the stability of their foster families would cause additional mental injury to the children.

**23.** Vivian also contends that because *"any"* placement of the children would result in emotional trauma there is no reason why they should not be reunited with their mother. In light of the ample evidence already discussed of the progress that each child has made with his or her foster parent, this assertion is clearly incorrect.

cure and unsafe. We find this conclusion is not clearly erroneous and that return of any of the children to Vivian would result in a serious risk of emotional damage to that child.

### 2. § 1912(d)

■ Vivian explicitly challenges the trial court's findings under § 1912(d). Vivian asserts that use of her medications had reduced the risk of future episodes of her Bipolar Disorder sufficiently to allow her to be an effective mother. Vivian sent a handwritten letter to Judge Greene saying that she has been attempting to get her life in order, both through participation in state-ordered treatment programs and by her marriage to Craig, and pleading with Judge Greene to allow her to retain custody of her children. However, while Vivian has complied with the rehabilitative efforts required of her, these efforts have failed to be successful in turning Vivian into a suitable parent. Thus, it is in the best interests of the children that Vivian's parental rights be terminated.

The trial court found by a preponderance of evidence that "[r]easonable and active efforts have been made to provide appropriate remedial services" to Vivian and that these efforts had been unsuccessful. Vivian actively participated in the three-phase treatment program laid out for her by DFYS. She has attended regular psychiatric appointments since her release from the Alaska Psychiatric Institute in the spring of 1998. By continuing to take her medication, which she has done, one doctor testified that Vivian can reduce the risk of an episode of Bipolar Disorder down to one mild episode in a ten-year span. She successfully completed substance abuse assessments in December 1998 and December 1999. She completed an alcohol education class in February 2000 and has only occasionally used alcohol, though even limited use may have negative interaction effects with her psychotropic medication. Vivian participated in one-on-one parenting training for seven months and has had regular visitation with her children. It is clear,

therefore, that active efforts at remedial services have been provided to Vivian, a point which she concedes. Vivian has done all that has been asked of her and there is nothing in the record to suggest that Vivian is being insincere in her attempts at rehabilitation. Furthermore, she has married someone who appears to provide a more stable home setting than existed with Keith, though this is a point of some dispute.

Despite these efforts, Vivian's parenting skills have only marginally improved and are not sufficient to make her an adequate parent. The therapist who provided her with parental skills training testified that Vivian acted in a "child-like" manner around the children and rarely showed any emotional connection to them. She especially had problems dealing with Michael. A child services worker, acting at the behest of DFYS, assessed Vivian as not being capable of parenting any or all of her children and recommended permanent placement of the children in homes other than with their mother. This assessment was confirmed by a DFYS case worker, who testified that despite her increased focus and recent marriage Vivian was still incapable of parenting even one of her children. A child psychiatrist testified that Vivian may face difficulties responding to the negative feelings her children may have toward her if returned. The psychiatrist treating Vivian for her Bipolar Disorder testified that she should avoid "unduly stressful" situations to avoid future incidents of decompensation and admitted that the return of her children could be a source of stress. The trial court further found that the marriage to Craig was not sufficient to overcome the parenting difficulties demonstrated by Vivian.

■ DFYS informed Vivian that completion of the recommended treatment programs did not guarantee the return of her children. This position is supported by Alaska law. In situations where the parent has not participated in the rehabilitation programs offered, termination of parental rights is clearly justified.[24] In the present case,

24. *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1093 (Alaska 2001) (affirming a ter-

mination of parental rights "in light of [the mother's] forgone opportunities to remedy her con-

though, Vivian has participated in the required programs and continues to take her medication. Still, the State can show that a parent has failed to remedy harmful conditions even when the parent has not been given an opportunity to actually parent his or her children.[25] Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.[26] It is entirely possible that there will be some improvement in overcoming mental illness without there being sufficient improvement to demonstrate adequate parenting skills.[27] This is the case with Vivian, who may have reasonably controlled her Bipolar Disorder but has failed to acquire adequate parenting skills despite state efforts to provide her with such.

## V. CONCLUSION

Vivian provided a poorly crafted brief, but not one so poor as to justify dismissing her appeal for cursory treatment. Each of the four children was clearly a child in need of aid. Judge Greene's finding that Vivian was incapable of being a suitable parent for any of her children is not clearly erroneous. Consequently, the decision of the superior court is AFFIRMED.

---

duct in the preceding seven months"); *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 951–52 (Alaska 2000) (affirming a termination of parental rights because mother "failed to participate" in several components of her reunification plan). A similar termination of parental rights is justified for a failure to take medication to control one's aberrant behaviors. *See A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1163 (Alaska 2000) (holding that failure to take medi-

cation to control mental illness placed children at a substantial risk of continued harm).

**25.** *A.H. v. State*, 10 P.3d at 1166.

**26.** *In re T.W.R.*, 887 P.2d 941, 945 (Alaska 1994), *overruled on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996).

**27.** *In re T.W.R.*, 887 P.2d at 946–47.