NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JEROME F., ) | |
| ) | Supreme Court No. S-16454 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-14-00426 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1633 – June 7, 2017 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Lars B. Johnson and Rachel Cella, Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Rebecca E. Hattan, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

I.      INTRODUCTION

A father challenges the trial court's decision terminating his parental rights to his son. The father argues the court erred by finding that prior to termination he was

---

\*      Entered under Alaska Appellate Rule 214.

given a reasonable amount of time to remedy the conditions placing his son at risk. Because the evidence supports the trial court's finding, we affirm the court's decision.

## II.    FACTS AND PROCEEDINGS

Jerome F. is the father of a young boy.[1]  In September 2014 police responded to the then-four-year-old boy's preschool because the boy was in possession of "a plastic dime bag which later field-tested positive for .5 grams of methamphetamine."  When asked what it was, he responded that it was "medicine" because "it would make you feel better."  He also stated that he had ingested some of it the day before and that he had found it either "in his back pocket" or "in his rock box at his mom's house."  The boy was taken for an interview and medical examination.  The boy tested positive for methamphetamine, indicating that he had ingested the substance. He did not require medical care.

Jerome had recently been released from prison and his son had stayed at Jerome's house the night before the preschool incident.  Although neither parent took responsibility for having the methamphetamine, Jerome admitted that it could have come from either of them.  Jerome's criminal record and incarcerations for methamphetamine-related offenses extend back almost two decades.

After the interview OCS placed the boy "with his maternal grandparents because at that time [OCS] couldn't determine where he had gotten the meth."  But the boy stayed with his grandparents for less than two weeks because "they couldn't have [him] full-time" for more than "a short-term basis."  Since leaving his grandparents' care the boy has lived in a foster home.

The superior court held a termination trial in July 2016.  Jerome surprised his attorney by not attending.  Placement was not directly addressed at trial, but everyone

---

[1]    A pseudonym is used for privacy.

involved previously had supported permanently placing the boy with his paternal aunt in Colorado.

The boy's therapist, the foster mother, and the OCS worker who initially assessed the boy all testified about his behavior when first removed. During his initial OCS assessment he "was very aggressive towards the nursing staff and then he was aggressive towards [his] mom." "At one point in time, he raised a fist and said he was going to knock her out, and [his] mom cowered." The foster mother testified that the boy "used to throw himself on the floor. He used to swear like a sailor. He would kick, he would hit the wall, he would throw things." The therapist testified that the boy was "aggressive," "lying and stealing at school," and believed that by lying and stealing he might be incarcerated with Jerome. The foster mother also testified that since living with his foster family the boy had "come a long way in his behavior management."

When the boy was first taken into OCS custody Jerome worked his case plan with the goal of reunification. The family case plan listed four goals for Jerome: (1) resolve his "legal issues" to "provide his child with a crime-free environment";[2] (2) be "a stable parent with an established routine" to "ensure[] that his child is in a safe and drug-free home";[3] (3) control his behavior and "pursue[] healthy relationships free

---

[2]     This included finding stable housing, submitting an application for an ankle monitor enabling him to serve pending jail time at home and care for his son, obtaining a landline telephone, and complying "with the conditions of his probation" and leading "a crime-free lifestyle."

[3]     This included getting a substance abuse assessment and doing random weekly urinalysis testing (UAs).

from domestic violence that are based on effective communication and positive support";[4] and (4) be "active in meeting [his son's] behavioral and educational needs."[5]

Jerome initially obtained stable housing, applied for an ankle monitor, got a landline telephone, complied with the conditions of his probation, participated in random UAs, completed substance abuse treatment, started domestic violence and parenting programs, and participated in an individualized education plan meeting for his son's schooling. But when Jerome's ankle monitor application was denied he was re-incarcerated. Because of his incarceration Jerome could not participate in the majority of the activities required by his case plan.

Jerome was again released from jail a few months before the termination trial took place. But after his release he did not follow his case plan. He instead failed to complete the domestic violence program, exhibited anger and violence toward his son's mother, refused to submit to UAs, and did not participate in his son's therapy. Jerome's attorney argued at trial that Jerome should nevertheless have more time to work his case plan because "he's still in the process of trying to get his life together . . . [after being] released."

The therapist, the foster mother, and an OCS case worker all testified about the importance of permanence and stability in the boy's life. The therapist testified "that the longer [he] is not in a permanent placement is increasing his unhealthy behaviors and his difficulty because he needs that consistency, so I feel like longer placement in foster care or uncertainty would not be healthy for him." The foster mother testified that

---

[4]     This included participating in weekly parenting courses, completing a domestic violence risk assessment, and participating "in a program aimed at perpetrators of domestic violence."

[5]     This required Jerome to "attend[] [his son's] therapy and counseling appointment[s] when appropriate."

having a permanent home "would put his mind at ease" and that "he needs to have a permanent placement soon." OCS's case worker testified that it would not be in the boy's best interests to give Jerome more time to work his case plan.

The superior court issued an oral decision terminating Jerome's parental rights in July 2016 and issued a written order in August.[6] The court found by clear and convincing evidence that the boy was a child in need of aid under subsections (1), (8), and (10) of AS 47.10.011.[7] The court found under AS 47.10.011(1) that Jerome "made only minimal efforts to support and communicate with" his son and that other than a visit in the week before trial Jerome had not had contact with his son "for months." The court found under AS 47.10.011(8) that Jerome "exposed [his son] to domestic violence in the household resulting in mental injury" to his son and that this exposure "manifested itself in [his son's] conduct, in some of the behavior problems he has shown." The court found under AS 47.10.011(10) that Jerome "has a long and extensive history of substance

---

[6] Under Alaska Child in Need of Aid (CINA) Rule 18(c), parental rights to a non-Indian child may be terminated at trial only if OCS shows the following by clear and convincing evidence: (1) the child has been subjected to conduct or conditions enumerated in AS 47.10.011; (2) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (3) reasonable efforts have been made to provide family support services designed to prevent the breakup of the family. OCS is also required to show by a preponderance of the evidence that the child's best interests would be served by termination of parental rights.

[7] AS 47.10.011 ("[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following: (1) a parent or guardian has abandoned the child[;] . . . (8) conduct by or conditions created by the parent . . . have (A) resulted in mental injury to the child; . . . and (10) the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child . . . .").

abuse going back almost two decades" which "substantially impaired" his "ability to parent" and "plac[es] [his son] at substantial risk of harm"; the court further found "strong evidence" that Jerome's substance abuse treatment attempts had not been successful. The court found by a preponderance of the evidence that it was in Jerome's son's best interests for Jerome's parental rights to be terminated. Regarding whether Jerome was afforded reasonable time to remedy his conduct the superior court stated only "[t]here is clear and convincing evidence that [OCS] has provided timely reasonable efforts to return [the boy] to the family home, but these efforts have been unsuccessful."

Jerome appeals the termination order, arguing only that "the trial court err[ed] in finding that [OCS] allowed [Jerome] a reasonable time to remedy the concerns that led OCS to take [his son] into state custody."

## III.   STANDARD OF REVIEW

"[W]hether a parent has 'remedied the conduct or conditions . . . that place the child at substantial risk' " is a factual determination.[8]  In a case involving the termination of parental rights we review a trial court's findings of fact for clear error.[9] Findings are clearly erroneous only if, after reviewing the record in the light most favorable to the prevailing party, we are left with a "definite and firm conviction that a mistake has been made."[10]

---

[8]      *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[9]      *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003).

[10]      *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

## IV.    DISCUSSION

Jerome's only argument on appeal is that he should have been given more "time to remedy the concerns that led OCS to take [his son] into state custody."  Jerome argues the trial court erred because:  (1) "delaying termination would not have delayed a potential permanent placement"; (2) he "had taken steps toward addressing" OCS's concerns when he was both in and out of prison; and (3) Jerome was "motivated . . . to work his case plan and . . . to continue doing so if given more time."

But the record reflects that Jerome was given a reasonable amount of time to remedy his conduct.  Alaska Statute 47.10.088(a)(2)(B) allows for the termination of parental rights if the parent "has failed, *within a reasonable time*, to remedy the conduct or conditions in the home that place the child in substantial risk."[11]  We have "emphasize[d] that the statute clearly puts the criteria for 'reasonable time' in terms of the child's needs,"[12] and we have indicated that what constitutes a reasonable time "is likely to be shorter for young children."[13]  Failing to follow a case plan may be sufficient

---

[11]    AS 47.10.088(a)(2)(B) (emphasis added).

[12]    *Christina J.*, 254 P.3d at 1108; *see also id.* at 1107 ("[T]he statute defines 'reasonable time' not as a specific number of months or by reference to parents' needs, but as 'a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments.' " (quoting former AS 47.10.990(28) (2010))).

[13]    *Id.* at 1107.

evidence that a parent did not remedy the situation,[14] and even "completion of a case plan does not guarantee a finding that [a parent] has remedied [his] conduct."[15]

But Jerome had a reasonable amount of time to remedy his conduct. The termination trial took place 22 months after his son was placed in OCS custody.[16] And there was ample testimony about the boy's need for permanency and stability, especially after having spent a substantial portion of his life without a permanent placement.

Jerome nonetheless argues that he should have been given more time to remedy OCS's concerns because termination would not cause his son to be placed with Jerome's sister any sooner, and not terminating his parental rights would create incentives for following his case plan. But both of these arguments for delaying termination benefit Jerome; the real question is whether the additional time would be reasonable from his *son's* perspective.[17] Because no testimony supported the idea that delaying termination would be in the boy's best interests, we reject both of those arguments.

---

[14] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 952 (Alaska 2013) ("A failure to comply with a case plan may constitute a failure to remedy." (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008))).

[15] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (citing *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002)).

[16] *See* AS 47.10.088(d) ("[OCS] shall petition for termination of a parent's rights to a child, without making further reasonable efforts, when a child . . . has been in foster care for at least 15 of the most recent 22 months . . . ."); *see also Christina J.*, 254 P.3d at 1106-07 (noting OCS may file for termination after 15 to 22 months).

[17] *See Christina J.*, 254 P.3d at 1107-08.

Jerome also claims that because he did not have access to the requisite programs to work his case plan while he was incarcerated, the superior court should have given him a reasonable amount of time after being released from prison to remedy OCS's concerns. But the record reflects that after Jerome's release he did not follow his case plan despite having the opportunity to do so. After being released Jerome did not complete a domestic violence program, acted angrily and violently toward his son's mother, did not participate in his son's therapy, refused to complete UAs, and did not participate in the termination trial. Because Jerome did not follow his case plan when he had the opportunity to do so, the superior court did not clearly err in finding that he was afforded reasonable time to remedy the problems identified by OCS.

## V.    CONCLUSION

Because the trial court did not clearly err in finding that Jerome was given a reasonable amount of time to remedy OCS's concerns, we AFFIRM the termination of his parental rights.